**Robert F. LEWIS and the Game Program, a Colorado limited liability company; and bert Matthews and the Homestand Flyer, a Colorado limited liability company, Plaintiffs–Appellees,**

v.

**COLORADO ROCKIES BASEBALL CLUB, LTD., Defendant–Appellant.**

No. 96SA381

Supreme Court of Colorado, En Banc.

June 30, 1997.

rely on evidence other than the testimony of a county commissioner who acted as an adjudica-

tor in the BOE proceeding.

Holland & Hart, LLP, A. Bruce Jones, Alan N. Stern, Denver, for Plaintiffs–Appellees.

Faegre & Benson, LLP, Thomas B. Kelley, Catherine A. Lemon, Steven D. Zansberg, Denver, for Defendant–Appellant.

Daniel E. Muse, City Attorney, James C. Thomas, Assistant City Attorney, Vincent A. DiCroce, Assistant City Attorney, Denver, for Amicus Curiae the City and County of Denver.

Justice MULLARKEY delivered the Opinion of the Court.

The Colorado Rockies Baseball Club, Ltd. (Rockies) appeal a judgment by the Denver District Court finding that certain areas around Coors Field baseball stadium are public forum property for free speech purposes and that the Rockies' policies preventing the sale and distribution of any materials in those areas were not reasonable time, place, and manner restrictions. The district court granted an injunction against the Rockies precluding it from restricting vendors in those areas. We agree that the disputed areas around Coors Field are public forum property and hold that the policies enforced by the Rockies in these areas were not reasonable time, place, and manner restrictions under the First Amendment to the United States Constitution. Accordingly, the judgment of the district court is affirmed.

## I.

Robert Lewis and Bert Matthews (Publishers) publish and distribute "alternative" baseball programs and scorecards outside Coors Field during Colorado Rockies' baseball games. The Rockies lease Coors Field and its surrounding walkways and sidewalks from the Denver Metropolitan Major League Baseball Stadium District (Stadium District), a public entity.[1] Coors Field is a newly constructed baseball stadium that opened for the 1995 baseball season. The Rockies have a long term concession agreement with ARA Leisure Services, Inc. (ARAMARK) which grants ARAMARK exclusive concession rights on the leased premises both inside and outside the stadium. Thus, the Rockies prohibit the sale or distribution of any materials by other vendors in these areas.

During the 1995 baseball season, the Publishers and their vendors were harassed and ticketed for trespass while attempting to distribute programs in certain areas around Coors Field. The specific areas in dispute

are the North Walkway, the Wynkoop Walkway, and the walkway between gates D and E.[2] The North Walkway runs perpendicular from the northeast side of the stadium into and through a paid parking lot, is physically separated from the closest city street by a concrete retaining wall, and is connected by a stairway to the public sidewalk on 22nd Street. *See* Appendix, diagram 1. The Wynkoop Walkway runs perpendicular from the southeast side of the stadium from gate E to 19th Street. The disputed portion of the Wynkoop Walkway includes the pedestrian footbridge that runs over 20th Street to gate E. *See* Appendix, diagram 2. The third disputed area is the walkway between gate D and gate E from the corner of Blake and 20th Streets along the third base side of Coors Field. *See* Appendix, diagram 3.

According to the Publishers, the Rockies' policies preventing the distribution of alternative baseball programs or other materials in the disputed areas are unconstitutional because all of the exterior sidewalks and walkways surrounding Coors Field that are accessible to the public are public forum property for free speech purposes. One of the Publishers, Robert Lewis, brought suit against the Rockies and the Stadium District seeking a preliminary and permanent injunction barring the Rockies and the Stadium District from infringing on his constitutional rights to engage in expressive activities outside of Coors Field.[3] After a one-day evidentiary hearing, Robert Lewis's motion for a preliminary injunction was denied by the district court on the grounds that the disputed area was not a public forum.

Subsequently, Bert Matthews filed suit, and the Publishers' combined cases went to trial on the merits just prior to the beginning of the 1996 baseball season. Before trial, the Stadium District agreed to be bound by the district court's decision and was dismissed from the case. After a three-day trial, the

---

**1.** The Stadium District is "a body corporate and politic and a political subdivision of the state." § 32–14–104, 13 C.R.S. (1996 Supp.).

**2.** The Publishers were ticketed for trespassing only in the North Walkway. However, the district court also ruled on the status of the Wyn-

koop Walkway and the walkway between gates D and E because the Rockies claimed the right to exclude plaintiffs from all three areas.

**3.** The other publisher, Bert Matthews, had not yet filed suit.

district court ruled in favor of the plaintiffs. According to the district court, "Coors Field and its environs are fully integrated into the downtown area from an architectural standpoint, from a landscape architect standpoint, and from any other conceivable standpoint." The district court also found that "the surface materials of the buildings and walks, the fences, barriers, street lights, the benches, plantings, the trash bins, etc. are all deliberately integrated to create a sense of public space." Therefore, noting that "[s]idewalks and walkways have traditionally been public," the district court concluded that the disputed areas at Coors Field were public forum property.

The district court next found that the Rockies' policies restricting free speech were content-neutral and therefore subject to intermediate scrutiny. Under that standard, the court considered whether the restrictions on free speech were narrowly tailored to serve a significant governmental interest and whether they left open ample alternate channels of communication. The district court accepted that almost all of the interests presented by the Rockies—i.e., premises liability, crowd control, safety, pedestrian movement—were significant. However, the court determined that the restrictions that were placed on the disputed areas were not narrowly tailored because other, more busy areas of Coors Field with greater congestion and crowd control problems had no restrictions.[4] The court also concluded that, above all, the Rockies were interested in restricting vending to maximize revenue. The court found that while maximizing revenue is a legitimate goal, "it is not an appropriate goal in the free speech arena."

The district court also concluded that the restrictions at issue did not provide ample alternative avenues for communication. The Rockies argued that because much of the area around Coors Field is unrestricted,[5] the

Publishers were provided with sufficient communicative outlets within which to distribute their programs. The district court, however, focused on the opportunity for alternative communication at each specific gate location and determined that "there is no ample or adequate alternative avenue for communication at gate A under the Rockies' restrictions." Based on its conclusion that the restrictions were not narrowly tailored and did not provide adequate alternatives for communication, the district court ruled that the Rockies should be enjoined from preventing the Publishers from selling or distributing their game programs in any of the gate areas subject to the institution of appropriate time, place, and manner restrictions.

## II.

Before considering the substantive issues this case presents, we must address a preliminary dispute concerning the appropriate standard for reviewing the district court's factual findings. The Publishers argue that we should apply the "clearly erroneous" standard, while the Rockies contend that a *de novo* standard is appropriate. According to the Publishers, the underlying rationale for independent appellate review in First Amendment cases is to *protect* the right to free speech, and not to give the state a second opportunity to justify its restriction of free speech. See *Bose Corp. v. Consumers Union,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984) ("[J]udges ... must exercise such review in order to preserve the precious liberties established and ordained by the constitution."). Therefore, the Publishers argue that a *de novo* standard of review should only be applied in cases where a lower court permits a restriction on free speech.

In *Bose,* the Supreme Court stated that it has "repeatedly held that an appellate court has an obligation to 'make an independent

4. The district court specifically referred to gate D which is located at the corner of Blake Street and 20th Street and experiences the most congestion of all of the Coors Field entrances. The Rockies stipulated that this area is public forum property where they place no restrictions on vending despite the fact that congestion is a problem.

5. The Rockies pointed out that there are no restrictions at gates B, C, and D. Thus, according to the Rockies, with the existing restrictions, the Plaintiffs had access to eighty percent (80%) of the Coors Field guests.

examination on the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose,* 466 U.S. at 499, 104 S.Ct. at 1958 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964)). However, the federal courts of appeals have split as to whether the *de novo* standard is applicable in cases where the government appeals a district court's judgment declaring a restriction on free speech unconstitutional.[6]

■ We have not specifically addressed when it is proper to apply a *de novo* standard of review in First Amendment cases. However, we effectively applied a *de novo* standard of review in *Denver Publishing Co. v. City of Aurora,* 896 P.2d 306 (Colo.1995), where we reversed a lower court order finding an ordinance unconstitutional as a restriction on free speech. *Id.* at 309. Consistent with the views of the Tenth and Eleventh Circuits, we find that *de novo* review is appropriate when determining the First Amendment status of government property because "the public forum issue is ... central to determining whether speech on [government property] can constitutionally be regulated." *Brown,* 915 F.2d at 1441. Moreover, the public forum determination is a mixed question of law and fact which demands an independent review of the record. *See Brown,* 915 F.2d at 1441. In this case, the physical facts are not disputed although the legal conclusions to be drawn from those facts are very much contested. Accordingly, we utilize an independent review of the record in reaching our conclusions in this case.

## III.

■ The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech...." Article II, section 10 of the Colorado Constitution, which provides greater protection of free speech than does the First Amendment, *see Bock v. Westminster Mall Co.,* 819 P.2d 55, 59 (Colo.1991), provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject."

■ In reaching the conclusion that the Rockies' policies were not reasonable time, place, and manner restrictions, the district court noted that its decision was based on the Colorado Constitution, and not the Federal Constitution. Likewise, the Publishers now urge this court to forgo a free speech analysis under the United States Constitution and to focus our inquiry on the greater protection offered by this state's constitution.[7] The Publishers point to our decision in *Bock,* and argue that this case presents another opportunity to further develop free speech jurisprudence under Article II, section 10.[8] How-

---

6. *Compare Daily Herald Co. v. Munro,* 838 F.2d 380, 383 (9th Cir.1988) (holding that when the government challenges a district court's determination that the government has unconstitutionally restricted free speech, a clear error standard is appropriate), *and Multimedia Publ'g Co. v. Greenville–Spartanburg Airport Dist.,* 991 F.2d 154, 160 (4th Cir.1993) (holding that the *Bose* requirement of independent review does not apply to a claim by the government that it has been wrongly prevented from restricting speech) *with Brown v. Palmer,* 915 F.2d 1435, 1441 (10th Cir.1990) (applying a *de novo* standard of review where district court declared a state restriction on free speech unconstitutional), *and Jones v. Heyman,* 888 F.2d 1328, 1330–31 (11th Cir.1989) (concluding that a *de novo* standard of review should be applied to the government's challenge of a district court's judgment that a public official had restricted a plaintiff's right to free speech).

7. The Publishers argue that we should utilize the more expansive state-law standard of free speech analysis adopted by the Ninth Circuit Court of Appeals in *Carreras v. City of Anaheim,* 768 F.2d 1039 (9th Cir.1985). The *Carreras* court, applying the protection of free speech accorded by the California State Constitution, held that the City of Anaheim could not ban free speech activities in the parking areas and pedestrian walkways surrounding Anaheim Stadium. *See Carreras,* 768 F.2d at 1045. The Publishers contend that, given the similarities between the "free speech" clauses of the California and Colorado Constitutions, the *Carreras* case offers persuasive authority for resolving the present dispute. For the reasons stated here, however, we need not address this argument.

8. In *Bock,* we considered whether a privately owned shopping center is a public forum for free speech purposes. We acknowledged in *Bock* that the United States Supreme Court, applying the First Amendment, had already answered this question in the negative. *Bock,* 819 P.2d at 58 (referring to *Hudgens v. N.L.R.B.,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976)). Howev-

ever, because the areas surrounding Coors Field at issue in this case are public forum property under the federal analysis, we find that it is unnecessary to address the more expansive protection of the Colorado Constitution. Accordingly, our inquiry is limited to the federal analysis.

The federal protection of free speech is guaranteed only against abridgment by the government. *See Hudgens v. N.L.R.B.*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). Here, however, the Rockies concede that the restrictions in this case constitute state action such that the constitutional protection of free speech is implicated. While the Rockies are a private entity, Coors Field and the surrounding sidewalks and walkways at issue are owned by a public entity, the Stadium District. Thus, the Rockies' policies are subject to applicable constitutional constraints.

Under federal constitutional jurisprudence, the analysis of a governmentally imposed restriction of speech "begins with an inquiry into the nature of the property affected by the regulation." *Denver Publ'g*, 896 P.2d at 309; *see also Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) ("[T]he extent to which the Government can control access [to its property] depends on the nature of the relevant forum."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.").

In *Perry*, the Supreme Court articulated three categories of public forum property: (1) a traditional public forum property; (2) a designated public forum property; and (3) remaining public property. *Perry*,

460 U.S. at 45–46, 103 S.Ct. at 954–56. The first category, a traditional public forum, includes places which " 'have immemorially been held in trust for the use of the public and ... have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Id.* at 45, 103 S.Ct. at 954–55 (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 514, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939)). Thus, public places "historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' " *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). In a traditional public forum, content-neutral restrictions of free speech are considered reasonable time, place, and manner regulations if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *See id.* Restrictions affecting public forum property that are not content-neutral, however, must be necessary to serve a compelling state interest and must be narrowly drawn to achieve that end. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

The second category articulated in *Perry* consists of government property that has been opened to the public as a place for expressive activity. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55. Whether a forum has been designated for expressive activity is determined by the state's intent in establishing the forum. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448–49. A state is not required to keep such a facility open to the public indefinitely. However, so long as a designated public forum remains open, it is bound by the same standards as apply to a traditional public forum. *See Perry*, 460 U.S. at 46, 103 S.Ct. at 955. Thus, "[r]easonable time place and manner regulations are permissible, and a content-based prohibition

---

er, because the Supreme Court had also "explicitly acknowledged each State's 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution,' " *Bock*, 819 P.2d at 59 (quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d

741 (1980)), we chose to analyze the issue under the Colorado Constitution. We found the concept of "public forum" to be more expansive under the Colorado Constitution and held that the private shopping mall at issue was a public forum for free speech purposes. *See Bock*, 819 P.2d at 61.

must be narrowly drawn to effectuate a compelling state interest." *Id.*

■ The final *Perry* category consists of public property that "is not by tradition or designation a forum for public communication." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. Limitations on expressive activities in a non-public forum "need only be reasonable as long as the regulation is not an effort to suppress the speaker's activities due to disagreement with the speaker's views." *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992).

As explained above, the areas in dispute here consist of various sidewalks and walkways surrounding Coors Field. The Supreme Court has specifically addressed the constitutional status of sidewalks in *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), and *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). *Grace* concerned the constitutionality of a regulation that prohibited the " 'display [of] any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement' in the United States Supreme Court building and on its grounds." *Grace,* 461 U.S. at 172–73, 103 S.Ct. at 1704 (quoting 40 U.S.C. § 13k). The prohibition in question was defined to include the public sidewalks marking the outer boundary of the grounds. *Grace,* 461 U.S. at 179, 103 S.Ct. at 1708.

In determining whether the public sidewalks surrounding the Supreme Court building were public forum property, the Supreme Court noted in *Grace* that sidewalks "traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inqui-

ry, to be public forum property." *Id.* The Court also distinguished the facts of *Grace* from those of *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), where the Court had held that streets and sidewalks within an enclosed military reservation were not public forum property. The Court pointed out that, unlike the sidewalks in *Greer,* "[t]here [was] no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve[d] as the perimeter of the Court grounds that they [had] entered some special type of enclave." *Grace,* 461 U.S. at 180, 103 S.Ct. at 1708. Therefore, the Court concluded that the sidewalks "forming the perimeter of the Supreme Court grounds ... [were] public forums and should be treated as such for First Amendment purposes." *Id.*

In contrast, the Supreme Court concluded in *Kokinda* that an interior sidewalk abutting a United States Post Office was not a public forum for First Amendment purposes.[9] In response to the argument that the interior sidewalk was a public forum because it was not distinguishable from the municipal sidewalk across the parking lot, the Supreme Court stated that "[t]he mere physical characteristics of the property cannot dictate forum analysis." *Kokinda,* 497 U.S. at 727, 110 S.Ct. at 3120. According to the Court in *Kokinda,* "the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." *Id.* As such, the Court placed great reliance on the fact that, unlike the municipal sidewalk that serves as a public passageway, the postal sidewalk "was constructed solely to provide for the passage of individuals engaged in postal business." *Id.*

Apparently relying on the rationale articulated in *Grace,* the district court determined that the sidewalks and walkways surrounding

---

9. The area at issue in *Kokinda* was described as follows:

> The Bowie post office is a freestanding building, with its own sidewalk and parking lot. It is located on a major highway, Route 197. A sidewalk runs along the edge of the highway, separating the post office from the street. To enter the post office, cars enter a driveway that traverses the public sidewalk and enter a parking lot that surrounds the post office building.

> *Another sidewalk runs adjacent to the building itself, separating the parking lot from the building. Postal patrons must use the sidewalk to enter the post office. The sidewalk belongs to the post office and is used for no other purpose.* *Kokinda,* 497 U.S. at 723, 110 S.Ct. at 3118 (emphasis added). The dispute in *Kokinda* was limited to the constitutional status of the interior sidewalk adjacent to the building.

Coors Field are public forum property because "[s]idewalks and walkways have traditionally been public" and because "Coors Field and its environs are fully integrated into the downtown area." With respect to the North Walkway, however, the district court specifically found that only the first three hundred feet of the North Walkway heading east from the stadium are public.

The Rockies argue that the district court erred as a matter of law when it ruled that the areas in dispute were traditional public forum property. Relying in large part on the Supreme Court's holding in *Kokinda*, the Rockies contend that the disputed areas serve only as a means of ingress and egress for Coors Field patrons. According to the Rockies, the caselaw upon which the district court based its decision pertains only to ordinary public parks, streets, and perimeter sidewalks adjacent to public streets, and does not pertain to what it characterizes as interior, on-premises walkways at issue in this case. We disagree.

■ Contrary to the Rockies' argument, the record supports the conclusion that, unlike the postal sidewalk in *Kokinda*, the areas in dispute here are not properly categorized as interior, onpremises walkways. In fact, the sidewalks and walkways surrounding Coors Field were specifically designed to be integrated into downtown Denver's street grid. As such, the sidewalks are not used solely for ingress and egress to the stadium but connect with, and essentially function in the same manner as, the municipal sidewalks throughout the downtown area. Further, as in *Grace*, the architectural design and layout of the sidewalks and walkways fail to indicate to the public that they have entered a private area. In this sense, the location of the area in question is important because "separation from acknowledged public areas may serve to indicate that the separated area is . . . subject to greater restriction." *Lee*, 505 U.S. at 680, 112 S.Ct. at 2706.

We agree with the Publishers that to a pedestrian standing at the corner of 20th and Blake Streets there is no significant difference between the Blake Street sidewalk, which the Rockies concede is a public forum, and the walkway between gates D and E, which the Rockies claim is not a public forum. Therefore, the disputed area between gates D and E is functionally indistinguishable from the ordinary public sidewalk adjacent to the Blake Street gates. We reach the same conclusion as to the Wynkoop Walkway. The exhibits reveal that the physical characteristics of the Wynkoop Walkway fail to indicate to the public that it is a private area.

■ As noted by the district court, the Rockies' strongest argument under the federal public forum analysis is with the North Walkway. The North Walkway is fifty to sixty feet below the grade level of the surrounding streets with a retaining wall running almost its entire length along Wazee Street. The North Walkway leads from gate A to a paid parking lot that is completely encircled by a security fence. Because gate A and the adjacent outfield portion of the stadium are at the same grade below Wazee Street, the North Walkway is level with gate A. Thus, much of the North Walkway is not easily accessible to the general public. Although the North Walkway is physically separated from the closest city street, it is not completely isolated from the public. A concrete stairway leads from the street level to the North Walkway in front of gate A. The district court concluded that at least part of the North Walkway was a public forum. More specifically, the district court ruled that the area directly in front of gate A and that portion of the North Walkway extending to the east away from gate A, "perhaps as far as three hundred feet" was a public forum.[10] We agree.

Although much of the North Walkway is only utilized by patrons of the park who have

10. The district court recognized the difficulty in determining exactly how much of the North Walkway was a public forum and stated at the time of its decision:

It is clear that as you move out a quarter of a mile, a half a mile, or maybe even a mile out

[from gate A on the North Walkway] that you are in a totally different environment, and it's totally enclosed. There is nothing around but that parking lot, and it is clearly in the nature of private property when you get out that way.

paid for parking, the area directly in front of gate A is also accessible to other pedestrians who walk down a short flight of stairs from the concededly public sidewalk on 22nd Street. As to this limited area of the North Walkway, there are no obvious visual cues indicating that the area is not public or that the area constitutes "some special type of enclave." *Grace,* 461 U.S. at 180, 103 S.Ct. at 1708. Further, the fact that the Rockies located the Rockpile (*i.e.,* the lowest priced, general admission seats) ticket office next to gate A requires the public to descend the stairway to the North Walkway if they wish to purchase general admission tickets. The area was therefore designed to be open to the public and not just to patrons utilizing the paid parking lot. Consistent with the principles set forth in *Grace* and *Kokinda,* we agree with the district court that this portion of the North Walkway, which is connected to the street level sidewalk on 22nd Street, is a public forum.

## IV.

Having concluded that all three of the disputed areas are public forum property under federal constitutional analysis, our next inquiry is whether the restrictions on free speech that were imposed by the Rockies were permissible. Under the First Amendment, the proper test for permissibility of government imposed restrictions in a public forum depends on whether the restrictions are content-neutral. As noted above, content-neutral time, place, and manner restrictions are permissible so long as they are narrowly tailored to serve a significant state interest and allow for ample alternative channels of communication. *See Denver Publ'g,* 896 P.2d at 311 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55). However, content-based restrictions must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. *See Denver Publ'g,* 896 P.2d at 311 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55). We consider these requirements in turn.

### A.

#### Content-neutral

A regulation or restriction on expressive activity is deemed content-neutral if it is "'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 295, 104 S.Ct. 3065, 3069–70, 82 L.Ed.2d 221 (1984)). In this case, the Rockies' policies banned the vending and distribution of any materials by anyone other than their exclusive licensee, ARAMARK. The district court concluded that the Rockies' policies were content-neutral, and we agree. The policies make no distinction "with respect to the type of solicitation proscribed, nor [do they] focus on the sale of any particular publication." *Denver Publ'g,* 896 P.2d at 313. Moreover, the effect of the policies remain "constant as to all communicative or noncommunicative material offered for sale." *Id.* Therefore, the Rockies must show that the policies at issue are narrowly tailored to promote significant state interests and allow for ample alternative channels of communication. *See id.* at 311.

### B.

#### Significant Governmental Interest

The Rockies have identified a number of government interests justifying the restrictive policies at issue. These include concerns about premises liability,[11] crowd control, safety, pedestrian movement, and maximizing revenue. The district court acknowledged that the first four interests articulated by the Rockies were valid and significant, but specifically rejected the notion that economic concerns were appropriate considerations in a free speech analysis.

As to economic interests, the Rockies argue that the district court misconstrued a portion of our opinion in *Denver Publishing.* In that case, we stated that "'economic impact is not a proper consideration in free

---

**11.** The Rockies argued that they were subject to additional liability exposure for torts committed

on their leased premises by third parties.

speech cases.'" *Denver Publ'g*, 896 P.2d at 317 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986)). According to the Rockies, this statement in *Denver Publishing* refers to the economic impact on the plaintiff's businesses. Further, the Rockies contend that the Supreme Court has often considered the government's economic interests when deciding whether a restriction on free speech is reasonable.

■ While we agree with the Rockies that our statement in *Denver Publishing* did not concern the economic interests of the government, we do not agree that the economic interests of the government are necessarily significant at this stage of a free speech analysis. The cases cited by the Rockies and the City and County of Denver as Amicus Curiae which discuss the government's commercial interests do so in the limited context of determining whether a particular property is a public forum. For example, in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court considered the fact that the city was engaged in a commercial venture before concluding that its restrictions on political advertising on buses were permissible because the buses were not a "First Amendment forum." *Lehman*, 418 U.S. at 303–04, 94 S.Ct. at 2717–18. Likewise, in *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 125, 101 S.Ct. 2676, 2683, 69 L.Ed.2d 517 (1981), the Court upheld a statute that prohibited placing unstamped material in a mailbox. In reaching the conclusion that mailboxes were not public forums, the Court considered the fact that one of the purposes of the statute was to prevent loss of revenue. *See Greenburgh*, 453 U.S. at 125, 101 S.Ct. at 2683. Thus, these cases do not support the Rockies' argument that economic concerns are relevant to the "significant government interests" portion of the time, place, and manner analysis.

In this case, we have already concluded that the sidewalks and walkways at issue are public forum property. The Rockies appear to argue that they have some greater interest in generating revenue in the disputed areas because the areas happen to be adjacent to Coors Field, a concededly non-public commercial venture. We find, however, that the ability of the Rockies to generate revenue in these disputed areas is no more significant than that of the Publishers. Further, even if we were to consider the Rockies' economic interest in maximizing revenue, the Rockies have failed to present any concrete evidence that the restrictions in place are necessary to protect them from any significant harm. Therefore, we agree with the district court that the economic interests of the Rockies are not an appropriate consideration at the "significant government interest" stage of a free speech analysis.

■ We also agree with the district court, however, that safety, crowd control, and pedestrian movement on the sidewalks and walkways surrounding Coors Field are significant governmental interests. "A State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron*, 452 U.S. at 650, 101 S.Ct. at 2565 (1981). There is no dispute that the sidewalks and walkways surrounding Coors Field are often crowded on game days. Clearly, therefore, some restrictions on free speech may be necessary to prevent congestion and ensure the safety of patrons entering and leaving Coors Field.

### C.

#### Narrowly Tailored

■ Finding that significant government interests justify restrictions of expressive activity around Coors Field does not end our inquiry. The Rockies also have the burden of proving that the restrictions at issue were narrowly tailored to serve those interests. *See Denver Publ'g*, 896 P.2d at 311 (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55). The requirement of narrow tailoring is satisfied if the restriction "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906–07, 86 L.Ed.2d 536 (1985)).

The district court found that the Rockies' total ban on vending or distributing was not logically related to the interests of safety and crowd control. The district court pointed out that gate D, which the Rockies concede is the busiest and most congested gate area, had the fewest restrictions in place. Thus, the district court concluded that the total ban on vending in the disputed areas was not narrowly tailored to serve the interests of crowd control, safety, and pedestrian movement.

We agree with the district court that the facts do not support the Rockies' contention that a total ban on vending is necessary in any of the disputed areas. Considered in their constitutional context, the lack of similar restrictions at more congested areas around the ballpark demonstrates that the Rockies have not "sustained [their] burden of showing the [restrictions] '[are] not substantially broader than necessary' to promote" the Rockies' significant interests in crowd control, pedestrian movement, and safety. *Denver Publ'g*, 896 P.2d at 314 (quoting *Ward*, 491 U.S. at 800, 109 S.Ct. at 2758–59).

Further, as the Supreme Court noted in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), "the nature of a place ... [and] the pattern of its normal activities ... dictate the kinds of regulations of time, place, and manner that are reasonable." 408 U.S. at 116, 92 S.Ct. at 2303 (internal quotation marks omitted). In this sense, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Id.* We agree with the Publishers that the distribution of game programs and scorecards before a baseball game is compatible with the normal activity of the areas surrounding Coors Field. Therefore, we hold that the Rockies' policies were not narrowly tailored to serve a significant state interest.

### D.

### Alternative Channels of Communication

The Rockies' policies totally ban the Publishers from distributing programs to fans entering through gate A from the north parking lots. At trial, the Rockies presented evidence that the stadium's perimeter sidewalks on Blake Street and 22nd Street, the unrestricted portion of the Wynkoop Walkway, and the many Denver public sidewalks in the immediate vicinity provided the Publishers with ready access to more than eighty percent of the people entering Coors Field. The Rockies argued that access to eighty percent of the fans is sufficient to meet the requirement that free speech restrictions allow for ample alternative avenues of communication. The district court disagreed and explained its view that "the issue should ... focus on the specific gate locations and their environs and the reality is that there is no ample or adequate alternative avenue for communication at gate A under the Rockies restriction."

The dissent in *Denver Publishing* argued that a city ordinance that precluded the selling of newspapers on street medians by hawkers was unconstitutional because it allowed for no alternative access to the public forum property involved, *i.e.*, the street medians. *See Denver Publ'g*, 896 P.2d at 325. We rejected this "narrow view of alternatives" and held that the city ordinance still allowed for ample alternative avenues of communication because the newspaper was also being sold by subscription, through free standing newsracks, and at grocery and convenience stores. *Id.* at 316–317.

The Rockies now argue that, like the newspapers in *Denver Publishing*, the scorecards and programs involved in this case could be distributed at neighborhood bars and restaurants, through retail sales outlets, and through paid subscriptions. According to the Rockies, the protected activity here is the distribution of the programs, not the specific distribution by the Publishers in the gate A area or other areas in dispute.

Alternative channels of communication have historically related "to the availability of different media of expression for substantially the same costs." *Denver Publ'g*, 896 P.2d at 316. Unlike newspapers, the scorecards and programs at issue in this case are designed specifically for persons

who are actually attending certain specific baseball games. We do not agree with the Rockies that persons attending baseball games can necessarily be reached by distributing the materials in bars, restaurants, or by mail. The alternative channels articulated by the Rockies are not functionally equivalent to on-site distribution and are not very likely to reach the intended audience. Therefore, we agree with the district court that the Rockies' policies effectively prevent the Publishers from reaching twenty percent of the ballpark's patrons and that these patrons are not realistically accessible to the Publishers by other means. Moreover, as the Supreme Court stated in *Schneider v. New Jersey*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." 308 U.S. at 163, 60 S.Ct. at 151–52. Thus, we conclude that the total ban on vending in the specified areas does not allow for ample alternative channels of communication.

## V.

In conclusion, we find that the district court correctly enjoined the Rockies from enforcing its total ban on vending in various areas around Coors Field. The disputed areas in question are traditional public forum property under a First Amendment free speech analysis. Therefore, the Rockies had the burden of showing that the restrictions on free speech were narrowly tailored to advance significant government interests and that the restrictions left open ample alternative channels of communication. We agree with the district court that the Rockies failed to meet that burden and that the Rockies' policies violated the First Amendment of the United States Constitution. The policies at issue were not reasonable time, place, and manner restrictions because they were not narrowly tailored and they did not allow for ample alternative channels of communication. Accordingly, we affirm the ruling of the district court to enjoin the Rockies from banning the Publishers from distributing their alternative baseball programs in the disputed areas around Coors Field.

## APPENDIX

**DIAGRAM 1: NORTH WALKWAY**

DIAGRAM 2: WYNKOOP WALKWAY

DIAGRAM 3: WALKWAY BETWEEN GATES D AND E