Gloria HOLLIDAY, individually and as a member of the board of directors of the Regional Transportation District; and Jack McCroskey, individually and as a member of the board of directors of the Regional Transportation District, Plaintiffs–Appellants,

v.

REGIONAL TRANSPORTATION DISTRICT; Robert L. Tonsing, individually and as chairman of the board of directors of the Regional Transportation District; and Brenda Bergman, individually and as executive assistant to the board of directors of the Regional Transportation District, Defendants–Appellees.

No. 00CA1778.

Colorado Court of Appeals, Div. V.

Sept. 27, 2001.

Certiorari Denied April 15, 2002. *

---

* Chief Justice MULLARKEY would grant as to the following issues:

Whether the court of appeals erred in ruling that RTD, in reserving board office staff for its own use, infringed on the First Amendment rights of Plaintiffs.

 A. Whether RTD board office staff can be reserved for the publication of governmant speech.

 B. Whether such a reservation must be viewpoint neutral.

Whether qualified immunity pursuant to 42 U.S.C.§ 1983 extends to an executive assistant for whom the ability to take official action is not readily apparent.

Ben Klein, Denver, CO, for Plaintiffs–Appellants.

Maria L. Lien, Associate Counsel, Regional Transportation District, Denver, CO, for Defendants–Appellees.

Opinion by Judge CASEBOLT.

In this action under 42 U.S.C. § 1983 asserting violations of the First Amendment, plaintiffs, Gloria Holliday and Jack McCroskey, appeal the judgment dismissing their

claims against defendants, Robert L. Tonsing, Brenda Bergman, and the Regional Transportation District (RTD). We reverse and remand for further proceedings.

Except as indicated, the following facts are either undisputed or are taken from plaintiffs' uncontroverted affidavits.

RTD is a political subdivision of the state that is authorized to develop, maintain, and operate a mass transportation system. Holliday is a current member of the RTD board of directors, and until January 1, 2001, McCroskey was also a board member. Tonsing served as the chair of the board of directors until January 2000, and Bergman is the board executive assistant responsible for the supervision of RTD administrative staff.

Members of the board, also known as district directors, are elected by geographic district. District directors maintain offices at RTD headquarters in Denver and have access to RTD administrative resources, including secretarial staff.

Among the functions traditionally carried out by RTD administrative staff is the typing and mailing of letters written by board members. Before the events giving rise to this case, district directors typically used RTD administrative staff to send letters communicating with other government officials and their constituents on RTD policy matters. The content of these communications typically included praise or criticism of RTD policy, staff, officers, and directors. This correspondence was not traditionally subject to review for content.

Acting in the wake of a particular instance in which administrative staff were used to communicate criticisms of RTD staff and former directors to the news media, Tonsing issued a memo to all district directors concerning the use of RTD resources. Tonsing's memo stated a new policy:

> RTD board resources, including staff assistance and materials, are available in support of directors' activities that clearly have to do with carrying out the agency's responsibilities under state law, and RTD by-laws and directives. Accordingly, I have directed the board staff not to provide such support when any reasonable

person would conclude that other agendas (some of which might in fact hinder the RTD mission) are at work.

The memo stated that Tonsing himself would make the determination regarding the use of staff in "borderline" cases.

After the resource policy was announced, plaintiffs continued to draft and submit their correspondence for typing by RTD administrative staff. On at least sixteen occasions, either Tonsing or Bergman returned plaintiffs' correspondence to them untyped. The draft correspondence for which plaintiffs were not given RTD staff assistance included letters to state officials and at least one letter to the editor of a local newspaper. Almost all of the letters as drafted showed copies going to members of local Denver media outlets.

The subjects of the untyped letters varied but all related to RTD matters. The letters included criticism of RTD policies with regard to light rail; allegations of conflict of interest against district directors; allegations of waste, mismanagement, electioneering, and cronyism against RTD officers; calls for termination of officers; and discussion of the issues surrounding an RTD bond ballot measure.

When returning the untyped draft correspondence, Bergman and Tonsing often included a note indicating the reason for the rejection of the correspondence. The reasons noted for rejection included that the correspondence contained personal attacks, name calling, unfounded accusations, slander, unsubstantiated claims, and statements that were contrary to RTD policy.

All of plaintiffs' letters rejected by Tonsing and Bergman were ultimately distributed by other means. Several of the letters, and the application of the resource policy itself, became the subject of local newspaper stories.

In the wake of the institution of the resource policy, plaintiffs alleged that other directors' correspondence was not rejected or scrutinized. In a memo to the board, Tonsing denied that other directors' correspondence was not scrutinized and insisted that only plaintiffs, and specifically plaintiff

McCroskey, had submitted correspondence that violated the terms of the resource policy.

Plaintiffs communicated their objections concerning the policy to both Tonsing and Bergman. According to plaintiffs' affidavits, both Tonsing and Bergman stated in response that they would not allow dissemination of correspondence that was unfavorable to RTD, and that the purpose of the policy was to ensure that plaintiffs could not disseminate their criticisms, but could only communicate information that was favorable to RTD. Tonsing also stated that he would do anything within his power to prevent plaintiffs from communicating information to their constituents that was contrary to RTD board policy.

Plaintiffs then initiated this proceeding, alleging violations of their First Amendment rights and their rights under article II, § 10 of the Colorado Constitution. Tonsing and RTD filed a motion for summary judgment, claiming that the policy did not constitute an infringement of plaintiffs' rights. Defendants Bergman and RTD separately filed a motion to dismiss on the basis that Bergman was not in a policymaking position and only acted on Tonsing's instructions.

The trial court granted both motions and ruled that the remaining motions, including a motion to add a defendant, were moot. Plaintiffs appeal the resulting judgment of dismissal.

## I.

Plaintiffs contend that the trial court erred in granting summary judgment on their claims. They assert that, drawing all inferences from the undisputed facts in their favor, there is sufficient evidence to warrant a trial on their claim that defendants violated their First Amendment rights and that, in any event, material issues of fact remain that preclude summary judgment. We agree in part.

We review a summary judgment *de novo. Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251 (Colo.1995).

*De novo* review is also appropriate when the issues raised touch on First Amendment concerns. In such cases, an appellate court must make an independent review of the whole record to ensure that the judgment rendered does not intrude on the right of free speech. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Mesa v. White,* 197 F.3d 1041 (10th Cir.1999); *Lewis v. Colo. Rockies Baseball Club,* 941 P.2d 266 (Colo.1997).

Summary judgment is appropriate only if the pleadings and supporting documents demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The burden is on the moving party to establish that no genuine issue of fact exists, and any doubts in this regard must be resolved against that party. The nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd., supra.*

We note initially that article II, § 10 of the Colorado Constitution provides greater protection for freedom of speech than does the First Amendment. *Lewis v. Colo. Rockies Baseball Club, supra.* Nevertheless, neither party argues that a conceptual framework different from First Amendment analysis governs this case when analyzed with respect to the Colorado Constitution. Instead, the parties have analyzed this case in the context of the protections accorded by the First Amendment. The supreme court has previously found it unnecessary to consider the more expansive protections of the Colorado Constitution where federal jurisprudence has established a framework for considering the restriction of speech on public property, *see Lewis v. Colo. Rockies Baseball Club, supra,* and we conclude likewise here. Accordingly, our analysis proceeds solely under the First Amendment.

Under federal constitutional jurisprudence, we follow a three-step approach to determine whether the policy at issue constitutes an impermissible intrusion upon First Amendment protections. First, we consider whether the claim involves protected speech and whether the government is involved in

its abridgment. *See Lewis v. Colo. Rockies Baseball Club, supra.*

■ Second, if the speech is subject to protection, we must determine the nature of the forum involved, because the extent to which the government may limit access depends on whether the forum is public or nonpublic. Because a principal purpose of a traditional public forum is the free exchange of ideas, speakers may be excluded from a public forum only if the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. Similarly, when the government has intentionally designated a place or means of communication as a public forum, speakers cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view. *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

Third, we determine whether the justification for exclusion from the forum satisfies the requisite standard. *Cornelius v. NAACP Legal Def. & Educ. Fund, supra; Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Mesa v. White, supra; Lewis v. Colo. Rockies Baseball Club, supra;* see also *Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

### A.

■ Concerning the first step, plaintiffs' letters here constitute protected speech. The letters address matters of public concern, including allegations of conflicts of interest, waste, mismanagement, and cronyism in the operation of a state agency. The letters also contain criticism of agency policy and the actions of agency officials. This speech is not only protected, but is entitled to the greatest protection within the framework of the First Amendment as speech by elected officials that criticizes public policy. *See Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). Moreover, because RTD acknowledges it is a government agency, it is the "government" that is regulating plaintiffs' speech.

### B.

Turning to the second step, we analyze the nature of the governmental property or process to which plaintiffs seek access and conclude that it is not a public forum.

■ The government need not permit all forms of speech on property or using processes that it owns and controls. To the contrary, the government, no less than a private property owner, has the power to preserve governmental property and processes to the uses for which they are lawfully dedicated. *Cornelius v. NAACP Legal Def. & Educ. Fund, supra, Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra.*

■ The typical public forum is property, such as public streets and parks, that traditionally has been used by the public for purposes of assembly and expression, and where such expression has always been subject to only minimal restriction. The limited or designated public forum is a location that the government has opened to the public for expression. Examples may include university meeting facilities and school grounds, if opened for use by the public. The nonpublic forum is public property that is not by tradition or designation a forum for public communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra.*

■ In analyzing the forum, we consider not only the nature of the tangible governmental property or process to which access is sought, but also the type of access that is sought. *Cornelius v. NAACP Legal Def. & Educ. Fund, supra.* In *Perry,* for instance, the "forum" was a school interoffice mail system to which a teachers union sought access. In *Cornelius,* the forum was a federal employee charity drive in which various advocacy groups wanted to participate.

Here, the forum is best described not as the physical location of RTD headquarters, but rather as the administrative resources at RTD headquarters, including secretarial staff

and funds involved in the typing and mailing of directors' communications.

■ We conclude that this forum is non-public in nature because neither the state nor RTD has offered the use of RTD resources to the public for expressive purposes. Further, the business of the RTD is to provide mass transportation, not to provide a public forum.

This conclusion is not altered by the fact that RTD resources are used by directors, including plaintiffs, as a means for communicating with the public. In *Cornelius,* advocacy groups claiming a right to participate in a federal employee charity drive relied on the fact that groups already involved in the drive were given the opportunity to include descriptions of their purposes and functions in the materials distributed to employees. This communication, the plaintiffs argued, transformed the charity drive into a forum for expression by these groups. The Court disagreed, concluding that the government did not create the charity drive as a forum for individual expression, but as a vehicle to encourage federal employees to make voluntary contributions to charity. The fact that expressive activity occurred incidentally did not alter the nonpublic nature of the forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, supra.*

Similarly, here, RTD resources exist to support the functions of the agency, not to create a forum for plaintiffs' expression. The fact that plaintiffs and other directors have used RTD resources as a means of communication with the public does not change the nature of the forum.

### C.

■ Turning to the third step, although the government may regulate speech in a nonpublic forum to reserve the forum for its intended purposes, communicative or otherwise, we must determine whether the distinctions drawn are both reasonable and viewpoint neutral. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra.* These requirements are conjunctive, not disjunctive. The existence of reasonable grounds for limiting access to a nonpublic forum will not save a regulation or policy that is in reality a facade for viewpoint-based discrimination. *Cornelius v. NAACP Legal Def. & Educ. Fund, supra.* We conclude that there are genuine issues of material fact here as to whether the distinctions drawn by defendants are viewpoint neutral.

■■ Discrimination against speech because of its message is presumed to be unconstitutional. It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700, 714 (1995).

With narrow exceptions in areas such as obscenity, viewpoint discrimination is almost universally condemned and rarely passes constitutional scrutiny. *Mesa v. White, supra.* The Supreme Court, applying the test of reasonableness and viewpoint neutrality, has struck down government restrictions that discriminated against a religious viewpoint. *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va., supra.*

■ In testing a policy for viewpoint discrimination, we may consider its application as well as the language of the policy on its face. *Mesa v. White, supra* (concluding that rule of procedure used to bar speaker at county commission meeting was a pretext for viewpoint discrimination); *Tucker v. Cal. Dep't of Educ.,* 97 F.3d 1204 (9th Cir.1996)(summary judgment inappropriate where facially neutral restrictions may be applied to discriminate on basis of viewpoint).

Here, plaintiffs assert that the resource policy has been applied only to them and the viewpoints they espouse, a charge that defendant Tonsing denies. The notations transmitted by Bergman and Tonsing appear to support plaintiffs' assertions that the policy was applied on the basis of disagreement with plaintiffs' views. None of these notations refers to the need to preserve resources, which was the facial reason given for establishment of the policy. Instead, the notations dispute the message contained in the correspondence. Rejections on the basis

that there are "unsubstantiated claims" or "unfounded allegations" evidence that the person reviewing the letter disagrees with the stance taken by the author.

Indeed, the face of the policy itself is not viewpoint neutral. Its specific language precludes support for "other agendas" that "might hinder" RTD's work.

In addition, defendants do not contest plaintiffs' assertions that Tonsing and Bergman admitted that the policy as adopted is a pretext for silencing plaintiffs' criticisms of RTD.

■ All of this evidence taken together raises issues of material fact concerning whether the resource policy as applied is an instance of pure viewpoint discrimination that the First Amendment cannot abide.

■ While viewpoint discrimination is always subject to the most stringent review, our concern is even greater given the circumstances of this case. Plaintiffs here were restrained in their effort to communicate criticism of governmental actions. " 'Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.' 'For speech concerning public affairs is more than self-expression; it is the essence of self-government.' " Burson v. Freeman, 504 U.S. 191, 196, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5, 12 (1992) (citation omitted; quoting Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488 (1966), and Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964)).

■ Plaintiffs' status as elected officials heightens our concern, for with that status they are entitled to receive the "widest latitude to express their views on issues of policy." Bond v. Floyd, supra, 385 U.S. at 136, 87 S.Ct. at 349, 17 L.Ed.2d at 247.

In Bond, the Supreme Court considered the claim of a state legislator that he had been denied the opportunity to take the oath of office and be seated as a member of the legislature because of statements he made in opposition to the Vietnam war. The state argued that the statements demonstrated a lack of loyalty to the state and the nation that precluded the plaintiff from taking the oath of office. The Court rejected that argument and affirmed the primacy of political speech by elected officials in the hierarchy of First Amendment concerns, stating: "Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them." Bond v. Floyd, supra, 385 U.S. at 136–37, 87 S.Ct. at 349–50, 17 L.Ed.2d at 248.

Plaintiffs, like the state legislator in Bond, are elected to represent a constituency defined by districting, and in that representative capacity they are obligated to debate and to vote on matters affecting public policy. See § 32–9–109.5, C.R.S.2001.

Our view is buttressed by Ridgeway v. Kiowa School District C–2, 794 P.2d 1020 (Colo.App.1989), a case with important similarities to this one. There, a division of this court reversed the summary judgment that had been granted in favor of the defendant school district and against the teacher-plaintiff claiming a violation of First Amendment rights. The division concluded that summary judgment was inappropriate in the face of a claim that the district, in issuing a formal reprimand to the teacher, had been motivated by a desire to punish the teacher for publishing remarks that were critical of the district. The division noted that summary judgment is usually inappropriate in cases dealing with potentially unconstitutional motivations. Because evidence concerning motive is almost always subject to a variety of conflicting interpretations, a full trial on the merits is normally the only way to separate permissible motivations from those that merely mask unconstitutional actions.

Similarly, here, the facts implicate the motivations of defendants in promulgating and applying the resource policy.

Accordingly, because plaintiffs' factual assertions in their affidavits coupled with defendants' denials raise substantial issues of

material fact, the summary judgment in defendants' favor cannot stand.

## II.

Defendants nevertheless argue that there was no actual infringement of plaintiffs' First Amendment rights because plaintiffs did not have a right in the first instance to use government resources to subsidize their own expression. Furthermore, they assert, the restriction involved, which merely withheld secretarial support and mailing costs, was so slight as to be *de minimis*. Defendants also point out that plaintiffs had reasonable alternative means of communicating, which they were not prevented from using. And, the fact that plaintiffs' criticisms were the subject of newspaper articles shows that plaintiffs were successful in communicating their message without the use of RTD resources. We are not persuaded.

 It is true that the government is not required to subsidize the exercise of fundamental rights, including the right to free expression. However, having made the determination to fund certain speech, the government may not discriminate among speakers based on viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va., supra.*

In *Rosenberger*, the Supreme Court ruled in favor of a religious student group that was denied university funding to print its newsletter while such funding was made available to other groups with secular viewpoints. Ruling separately that funding this religious group would not violate the establishment clause of the First Amendment, the Court concluded that once the university offered funding to student groups wishing to convey a message, the university could not silence the expression of selected viewpoints. *Rosenberger v. Rector & Visitors of Univ. of Va., supra.*

 Here, once the RTD provided funding and resources to directors to communicate with their constituents and others, it could not thereafter selectively foreclose the dissemination of other viewpoints regarding RTD business.

 Moreover, regulation of speech that does not amount to a total prohibition may nevertheless impermissibly infringe the freedom of speech. The Supreme Court has particularly noted the deterrent or chilling effect of government restrictions that fall short of direct prohibitions on speech. *See United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

For example, the Court has held that a parade permit fee that varied based on the content of the speech of the applicant was unconstitutional, and that it was of no moment that the fee in question could be nominal. "A tax based on the content of speech does not become more constitutional because it is a small tax." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 136, 112 S.Ct. 2395, 2405, 120 L.Ed.2d 101, 115 (1992).

In *Perry Education Ass'n, supra,* the Court applied its forum analysis to the regulation at issue despite the fact that the regulation could be characterized as *de minimis,* because the regulation only denied a teachers union access to school interoffice mail facilities. It was undisputed that the union was seeking a right to use government resources to facilitate private communication. It was also uncontested that alternative modes, such as the regular mail, existed and were used by the union for communication. The Court, while taking these factors into account in finding the regulation at issue reasonable for a nonpublic forum, considered the union's claims on the merits, and noted that such a restriction would not be acceptable if it discriminated on the basis of the speaker's viewpoint.

Here, applying the *Perry* proscription against viewpoint discrimination, the fact that defendants are restricting plaintiffs' speech in a way that does not amount to total prohibition and that alternative means of communication remain, does not rescue a policy that may be used to discriminate against plaintiffs based on disagreement with their views.

## III.

 Defendants also argue that the policy was not an effort to restrict directors'

individual expression, but rather was designed to regulate the speech of directors when they were speaking on behalf of RTD. We reject this argument.

When the government designates someone to speak for it, it is free to regulate the content of that speech. However, such viewpoint-based restrictions are not allowed when the government does not itself speak, but rather, expends funds to allow others to speak. *Rosenberger v. Rector & Visitors of Univ. of Va., supra.*

Here, while RTD may regulate the speech of those who speak on its behalf as an organization, as defendants themselves have repeatedly called to our attention, plaintiffs admit that their correspondence was not intended to represent the position of RTD as a whole.

Using that admission as a rationale for rejecting the correspondence, defendants urge that the policy not only regulates the speech of those who speak for it, but also forbids any communication by directors when they are not speaking on RTD's behalf. Such a prohibition may not only run afoul of the rationale of *Bond* in that it restricts the ability of elected officials to criticize the government, but it also runs counter to a 1997 directive passed by the board. The directive, entitled "Regarding who may speak for the RTD Board," specifically authorizes directors to issue communications reflecting their own views, provided that they do not give the impression that they are speaking for the board as a whole. The directive instructs directors to use RTD letterhead designating the individual director when sending such individual correspondence.

The implication of the directive is that directors are entitled to use RTD resources when issuing such communications. The resource policy, issued personally by Tonsing as chair, would violate the terms of that directive if interpreted to proscribe all such director communications.

Defendants also point to another 1997 directive concerning the issuance of news releases. That directive limits the use of RTD resources in the preparation of news releases to those disseminated by the Chief Public Affairs Officer, and specifically prohibits directors from using RTD resources to issue personal news releases. But, that directive is limited to the issuance of news releases and does not limit the use of RTD resources for other correspondence. Defendants have not alleged that the correspondence at issue here, all of which is directed to individual recipients, consists solely of news releases.

Taken as a whole, defendants' argument that the policy concerns RTD's effort to regulate who will speak on its behalf is not supported by the undisputed facts, and does not alter the asserted fact that the policy was applied to regulate plaintiffs' speech, which all parties agree was not made on behalf of RTD.

## IV.

Plaintiffs additionally contend that the policy and its application against them represent a form of retaliation for the exercise of their right to freedom of speech. They again assert there are genuine issues of material fact that preclude summary judgment on this claim. As before, we agree in part.

The government may not punish individuals for exercising their fundamental rights. *Rankin v. McPherson, supra; Ridgeway v. Kiowa Sch. Dist. C–2, supra.*

The trial court concluded that the application of the resource policy itself could not suffice as an act of retaliation. However, nothing in the law prevents the conclusion that a regulation attacked on First Amendment grounds can also be an act of retaliation against individuals for exercising their First Amendment rights.

The assertion that a government official acted to retaliate, when disputed, raises a material issue of fact. Because plaintiffs' affidavits raise the issue of retaliation through the policy, and plaintiffs have alleged that Tonsing instituted the policy to silence them, summary judgment on this issue in favor of defendants cannot stand.

Plaintiffs additionally have alleged that Tonsing made racially biased remarks to Holliday, who is African–American, and de-

nied reimbursement of portions of her expenses. However, plaintiffs have not pleaded a claim based on racial discrimination. Under the undisputed facts, any racially biased statements Tonsing may have made (which he denies) were motivated by personal racial bias and did not consist of a form of retaliation for plaintiffs' exercise of their First Amendment rights.

The denial of reimbursement of expenses is another matter, however. The trial court concluded that the accusation of racial bias was linked to the denial of reimbursement and therefore that both were unrelated to plaintiffs' exercise of their right to freedom of speech. A close review of plaintiffs' affidavits reveals that plaintiffs do not expressly link the denial of reimbursement of expenses to the chair's alleged racially biased remarks.

In any event, however, we must resolve all doubts concerning the asserted facts in plaintiffs' favor. *See Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd., supra.* Holliday's assertion is that the chair denied reimbursement of her expenses as a means of retaliating against her exercise of First Amendment rights. Tonsing, in his affidavit, denies that he has refused to grant reimbursement in retaliation.

This disputed issue of material fact independently precludes the entry of summary judgment on the claim that defendants retaliated against Holliday for exercising her First Amendment rights.

### V.

Next, plaintiffs contend that the trial court erred in dismissing their claims against defendant Bergman in her official and individual capacity and against RTD arising from Bergman's actions. We agree that the dismissal cannot stand.

Bergman and RTD's motion to dismiss was considered by the trial court in conjunction with the motion for summary judgment. The trial court did not separately address the motion to dismiss in its order, except to indicate that it was treating the motion as a motion for summary judgment pursuant to C.R.C.P. 12 and 56. Hence, as with defendants' other motion for summary judgment,

our review of this motion is *de novo*. *See Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd., supra.*

### A.

■ Concerning the claim against Bergman in her official capacity, we note that government officials may be sued in their official capacities, but such suits are treated as suits against the entity. There is no difference between suing a state employee in his or her official capacity and suing the state. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *State v. Nieto,* 993 P.2d 493 (Colo. 2000).

■ Governmental entities subject to suit under 42 U.S.C. § 1983 may be held liable where an unconstitutional action implements or executes the official policy of the entity. However, such governmental entities cannot be held vicariously responsible under a theory of respondeat superior for the unauthorized acts of employees. *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *County of Adams v. Hibbard,* 918 P.2d 212 (Colo.1996).

■ Here, RTD concedes that the resource policy promulgated by Tonsing is official policy. Therefore, if Bergman executed the official policy set by Tonsing when she rejected plaintiffs' letters, and if that rejection was an unconstitutional abridgment of plaintiffs' freedom of speech, then the causal link between RTD's official policy and the unconstitutional act can be established, and RTD can be held liable directly, not vicariously, for the violation. *See County of Adams v. Hibbard, supra.*

■ To the extent RTD argues that it cannot be held liable for Bergman's actions in carrying out the policy because she herself was not in a policymaking position, we reject the argument.

Bergman need not be a policymaker for RTD to be liable for her actions. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)(county may be held liable for actions of deputy sheriffs in carrying out county prosecutor's policy). In-

deed, RTD does not contend that Bergman departed from the resource policy and acted independently in reviewing plaintiffs' correspondence. To the contrary, RTD insists that Bergman at all times acted subject to Tonsing's policy and supervision.

■ Accordingly, this case is unlike *Hibbard*, but like other cases under 42 U.S.C. § 1983 in which a government official executes a directive created by a superior with policymaking authority. In such cases, the governmental entity is directly responsible for the official act of making the policy, and for the execution of the policy that follows, whether or not the employee who actually executed it was a policymaker.

Hence, the dismissal of claims against Bergman in her official capacity, and against RTD arising from Bergman's actions, was erroneous.

### B.

■ With respect to Bergman individually, the parties agree that individuals may be personally liable under 42 U.S.C. § 1983 for acts under color of law that are not subject to qualified immunity and result in a violation of civil rights. *County of Adams v. Hibbard, supra.*

■ Qualified immunity is generally available to government officials in the exercise of discretionary functions, but does not apply when an official violates clearly established constitutional rights of which a reasonable person would have known. When, as here, guiding and controlling principles of the First Amendment are clearly established, a government official will not be protected by qualified immunity for acts that the official would be expected to know violate constitutional protections. *See County of Adams v. Hibbard, supra.*

■ Here, plaintiffs' complaint and affidavits assert that Bergman took actions to restrict their speech by rejecting correspondence they submitted for typing. Moreover, plaintiffs' assertion that Bergman stated to them that the purpose of the resource policy was the suppression of their speech sufficiently alleges her knowledge that her ac-

tions were a violation of plaintiffs' constitutional rights.

Defendants' admissions, taken together with plaintiffs' assertions concerning the statements made by Bergman to the effect that she would not allow criticism of RTD to be disseminated, establish that there is a material issue of fact regarding whether Bergman was acting at the direction of Tonsing or independently.

Accordingly, the summary judgment as to the claims against Bergman in both capacities and against RTD for her actions cannot stand.

### VI.

To the extent that plaintiffs contend that the chair, Tonsing, lacked authority to institute the resource policy, we reject that contention.

The RTD by-laws authorize the chair to supervise and give day-to-day direction to the board executive assistant. The job description of the board executive assistant includes management of office staff and resources.

Thus, the chair was authorized to control the use of staff resources and to promulgate policy regarding their use.

### VII.

Defendants contend that Mary Blue, though denominated as a party to this appeal by plaintiffs, is not properly a party because the trial court denied, as moot, plaintiffs' motion to add her as a party. Because we reverse the judgment that rendered that motion moot, we direct the trial court to reconsider the motion to add Blue as a defendant.

Finally, also in view of our disposition, we do not address plaintiffs' vagueness challenge to the resource policy. The trial court may revisit this claim if plaintiffs again raise it on remand.

We need not address plaintiffs' remaining contentions.

The judgment is reversed, and the case is remanded to the trial court with directions to reconsider the motion to add Mary Blue as a

party defendant and to proceed with the consideration of plaintiffs' claims.

VOGT and CRISWELL,** JJ., concur.