In re the PEOPLE of the State
of Colorado, Plaintiff

v.

Shareef ALEEM, Defendant.

No. 06SA90.

Supreme Court of Colorado,
En Banc.

Jan. 8, 2007.

John W. Suthers, Attorney General, Melody Mirbaba, Assistant Attorney General, Denver, Colorado, for the Trial Court.

K. Mark Burton, Denver, Colorado, for Defendant.

Justice BENDER delivered the Opinion of the Court.

## I. Summary

In this original proceeding, we review the trial court's holding of Petitioner Shareef Aleem in criminal contempt and its sentence to forty-five days in county jail. Initially, the trial court held Aleem in contempt until he removed his Stanley Tookie Williams T-shirt. Thereafter, the court retracted its initial contempt by allowing Aleem to wear this T-shirt for the remainder of that day of trial. The court never warned that any of his other behavior at trial placed him in danger of being held in direct contempt. At the conclusion of the trial, the court ordered Aleem to show cause why he should not be held in contempt for failing to follow its order to remove his T-shirt. It set the show cause hearing for several weeks later.

At this hearing, the court held Aleem in contempt, citing his misbehavior as: (1) refusing to obey its order to remove his T-shirt; (2) arriving thirty-seven minutes late to court; (3) yelling and calling the court names such as "demonocracy"; and (4) orchestrating his supporters to stand and chant. The court allowed Aleem and his attorney to speak but stated that it had already decided the issue of contempt and that the only decision left was to determine Aleem's sentence. After pronouncing a sentence, the court denied a stay of execution. Aleem petitioned this Court under Rule 21 and we issued a rule to show cause and a stay of the sentence. We now make the rule absolute.

Aleem argues that the trial court's contempt finding and sentence should be vacated. He argues that: (1) wearing the Tookie Williams T-shirt is protected by the First Amendment and thus, a defense to contempt; and (2) the trial court abused its discretion when it held him in contempt for refusing to remove his T-shirt and for his other behavior at trial.

Although the T-shirt containing political expression is protected speech, we hold that this type of speech is not protected inside a courtroom. As the trial court stated, the courtroom is a place for the presentation of evidence and not for political expression. It is a non-public forum for First Amendment purposes. A court has the authority to restrict political speech within the courtroom to preserve its purpose as a forum for adjudication of civil and criminal disputes and to protect the parties' rights to a fair trial, and here, we conclude that the trial court's restriction on Aleem's speech was both reasonable and viewpoint neutral. Hence, the trial court's order to Aleem to remove his Tookie Williams T-shirt did not violate his First Amendment rights.

Although we recognize that it was within the trial court's discretion to order Aleem to remove his Tookie Williams T-shirt, the trial court failed to follow appropriate contempt procedures, and, therefore, we vacate the trial court's contempt finding. We hold that the court abused its discretion when it held him in direct contempt for this and other

behavior. We conclude that the trial court: (1) failed to warn Aleem before holding him in direct contempt for behavior that was not extreme under Colorado Rule of Civil Procedure 107(a)(2) (2006); and (2) inconsistently ordered Aleem to remove his Tookie Williams T-shirt and then permitted him to wear it in front of the jury, such that it nullified any justification for its initial order to remove it.

Consequently, we make the rule to show cause absolute and reverse the trial court's contempt finding and sentence.

## II. Reasons for Granting Writ

■ Aleem urges this Court to grant original jurisdiction pursuant to Colorado Appellate Rule 21 (2006) because he cannot pursue an adequate remedy through an appeal. He contends it would be fundamentally unfair to require him to serve his sentence without first having his judgment and sentence reviewed. We agree.

■ This Court has the discretion to determine whether to exercise original jurisdiction over a case pursuant to C.A.R. 21. C.A.R. 21(a)(1); *Fognani v. Young*, 115 P.3d 1268, 1271 (Colo.2005). Relief under C.A.R. 21 is extraordinary and therefore limited in purpose and availability. C.A.R. 21(a)(1); *People v. Dist. Court*, 790 P.2d 332, 334 (Colo.1990). We may only grant relief under C.A.R. 21 when the trial court has exceeded its jurisdiction or to review a serious abuse of discretion when appellate review would be inadequate. C.A.R. 21(a)(1); *People v. Miller*, 25 P.3d 1230, 1231 (Colo.2001).

■ Original jurisdiction is an appropriate means to review contempt orders. *Halaby, McCrea & Cross v. Hoffman*, 831 P.2d 902, 906 (Colo.1992); *Losavio v. Dist. Court*, 182 Colo. 180, 512 P.2d 266 (1973). This Court has exercised jurisdiction in a contempt case similar to the case at hand. In *Losavio*, a district attorney was held in contempt of court and sentenced to fifteen days in jail. *Id.* at 266. He filed a writ of prohibition in this Court to prevent the execution of the sentence and we issued a rule to show cause ultimately vacating the contempt judgment. *Id.* Original jurisdiction is appropriate when a petitioner risks being further sanctioned for contempt if review is not granted. *Halaby, McCrea & Cross*, 831 P.2d at 906 (citing *Losavio*, 512 P.2d at 267). Original jurisdiction is appropriate in this case because Aleem has been sentenced to immediate incarceration stayed only upon our order. No adequate remedy is otherwise available.

## III. Facts and Proceedings Below

Aleem's attire first became an issue on the second day of trial when the prosecutor objected that it impermissibly injected political issues into the trial. Aleem's T-shirt said "U.S. History 101" and had a picture of a white overseer whipping a black slave. The court ordered Aleem to remove the shirt to protect his and the People's right to a fair trial, stating that his T-shirt might improperly influence the jury. Aleem complied with the court order and changed his shirt.

The next day at trial, Aleem arrived thirty-seven minutes late wearing a T-shirt saying "Redemption" and depicting Stanley "Tookie" Williams, a black man who had been executed in California shortly before Aleem's trial. Upon objection by the prosecution that the T-shirt impermissibly introduced outside issues into the trial, the court ordered Aleem to remove his T-shirt. Aleem refused, stating that he wore the T-shirt for political reasons. After Aleem's fourth refusal to remove his shirt, the court held him in contempt and ordered him into custody.

Recognizing that both the prosecutor's objection to the Tookie Williams T-shirt and Aleem's refusal to remove it arise from its symbolic meaning, we must digress to explain its significance.[1] The trial court's an-

---

1. In its answer to the Rule to Show Cause, the trial court alleges that messages presented by this shirt are derived from the man that Tookie Williams was. According to the *Petition for Executive Clemency on Behalf of Stanley Tookie Williams* submitted to the governor of California prior to his execution, after being sentenced to death and placed on death row, Tookie Williams, a founder and leader of the Crips gang, openly renounced his prior life and spoke of the futility of gang violence. *Petition for Executive Clemency on Behalf of Stanley Tookie Williams* at 1 (Nov. 8, 2005), http://www.cmp.com/pdf/executive clemency.pdf. Williams dedicated the remainder of his life on death row to openly condemning gang violence by warning others—gang members, at risk youth, and educators—of the errors of the path he followed and by writing books, including children's books on the dangers of

swer to the Order and Rule to Show Cause informs us regarding the political debate surrounding Stanley Tookie Williams. It states that it is common knowledge that Williams was convicted of murder, sentenced to death, and executed only a few months before Aleem's trial. Further, it notes that Williams received a great deal of media attention, was well-known to the public, and spurred political debate concerning the death penalty. Aleem argues that the image of Tookie Williams accompanied by the word "redemption" also has religious significance because redemption is a religious term that means "to be free from the consequences of sin."

The court, Aleem, and Aleem's attorney engaged in a long colloquy which spanned twenty-five pages of the record discussing the political meaning of this T-shirt and the court's reasons for ordering Aleem to remove it. The tone of this discussion was one of escalating frustration. While the court continually asserted its duty to maintain the order and decorum of the courtroom, Aleem remained adamant that he was being singled out for unfair treatment and that he should be able to exercise his rights as a political advocate.

During this discussion, Aleem argued that he was a political activist and said he would not change the clothes that he wears every day, stating that he did not feel that he "should be forced to change [his] attire to [be in court] and put on some monkey suit or something out of character with who [he is]." Aleem then accused the court of discriminating against his T-shirt's particular message. He said that the court would allow shirts advocating mainstream political positions in the courtroom. He accused the judge of hiding behind the podium and called the court a "demonocracy." As he was being taken into custody he warned, "if anything happens to me in your custody ... the People will be held accountable for this" and "I know what you devils is about."

The court responded to Aleem's arguments stating that a courtroom is not a place for political activism, but for the presentation of

evidence. It informed Aleem that its job is to protect his and the People's right to a fair trial and that it was within the court's authority and discretion to make sure that nothing interfered with the integrity of the criminal process. The court stated that the problem with the T-shirt was what it "potentially says to the jury" because it could be an "improper influence on [them]."

The court also explained that it would require others to remove clothing with other political messages if the attire was brought to its attention or the subject of an objection. As an example the court stated that if the prosecutor was wearing a tie with a political symbol on it, "I'd say, you need to go change your tie."

This colloquy was interrupted at one point when the court ordered that Aleem be taken into custody. While Aleem was in custody, the trial court discussed Aleem's behavior with his attorney, informing his attorney that it would not tolerate any further political attire for the remainder of the trial and asking Aleem's attorney to communicate to Aleem that the court did not want any additional "outbursts" or "affront to the dignity of [the court]."

After taking a recess to give Aleem's attorney an opportunity to talk with Aleem in private, the court brought Aleem back into the courtroom to continue with the trial. Before the jury was brought in, the court gave Aleem another opportunity to speak. Aleem apologized to the court for his behavior stating that he did not mean to be disrespectful to the court. However, he continued to assert his right to wear this shirt in the courtroom.

The court stated that it respected Aleem's position, but repeated its reasons for keeping political statements out of the courtroom. After much discussion, the court allowed Aleem to wear his Tookie Williams T-shirt for the remainder of the day, but warned him not to wear clothes bearing political statements for the remainder of the trial.

gang violence. *Id.* at 6. He was nominated for a Nobel Peace Prize and Nobel Prize in Literature

based on his anti-gang work. *Id.* at 8.

When the court ordered removal of Aleem's handcuffs, the Deputy Sheriff asked whether that meant Aleem was completely out of custody. Aleem also requested clarification from the court as to whether he was still in custody. When the court stated that it had found him in contempt of court and that he remained in custody, Aleem refused to have his handcuffs removed, stating that he would rather "get it resolved now" or go back to jail than sit in the courtroom under arrest.

The record does not indicate when, but before the jury was returned to the courtroom, Aleem's handcuffs were removed. In the interest of continuing with the trial, the court then issued Aleem an order to show cause why he should not be held in contempt and set a hearing date following the conclusion of trial.

At the show cause hearing, Aleem requested an evidentiary hearing which the court denied. The court reasoned that no hearing was required because it held Aleem in direct contempt for behavior which occurred in its presence. The court said the only reason it had delayed the show cause hearing was to avoid further delay of the trial, not to provide Aleem with the opportunity for an evidentiary hearing. Throughout the hearing, the court implied that it had already decided the issue of contempt and the purpose of the show cause hearing was to determine Aleem's sentence:

> All right, this matter comes before the Court upon the Court's finding that Mr. Aleem was in direct contempt of the Court's order that occurred during trial in this matter.... I set [the matter] over for sentencing not because he is entitled to a hearing but because of the fact that the trial needed to be completed.... [Aleem] willfully, intentionally disobeyed a Court order and for that reason he was found in contempt ... I found you in contempt and today I am sentencing you to forty-five days in the Adams County Jail.

The court cited Aleem's "egregious" and "out of control" behavior: his thirty-seven minute tardiness on the third day of trial,

wearing a political T-shirt that he knew would be unacceptable from the court's order the previous day, willfully and intentionally disobeying the court's order to remove it, yelling at the court and calling the court a "demonocracy" (which Aleem defined as "the rule of devils and demons"), and encouraging his supporters to stand and chant in the courtroom.[2] Aleem's attorney stated that he understood prior to the hearing that the contemptuous behavior concerned Aleem's T-shirt. The trial court never warned Aleem during the trial that his behavior, other than refusing to remove his T-shirt, placed him at risk of being held in contempt.

After providing the basis for its contempt finding, the court heard statements on Aleem's behalf, including arguments that Aleem's shirt was a lawful expression of free speech under the First Amendment. The court also allowed Aleem to speak, at which time he apologized for his behavior and further explained why wearing the Tookie Williams shirt was important to him.

The trial court sentenced Aleem to forty-five days in county jail and denied his motion to stay the execution of his sentence.

## IV. Analysis

We begin our analysis with a discussion of a trial court's inherent authority to control the courtroom. We then turn to Aleem's argument that the contempt and sentence should be vacated because wearing a political T-shirt in the courtroom is protected speech under the First Amendment. We hold that his conduct was not constitutionally protected in the courtroom because the courtroom is a non-public forum for First Amendment purposes and the trial court's restriction on his speech was both reasonable and viewpoint neutral.

Next, we address Aleem's argument that the trial court abused its discretion when it held him in contempt for refusing to remove his T-shirt and for his other behavior at trial. While we recognize that the trial court had the discretion to hold Aleem in contempt for refusing to obey a lawful court order, we hold

---

2. The record certified to us does not include the portion of the trial transcript where this incident occurred, and so we do not consider whether this behavior provided a basis for the trial court's contempt finding.

that the trial court abused its discretion on the facts of this case. First, the trial court failed to warn Aleem before holding him in direct contempt for his other behavior at trial, which we conclude was not so extreme that no warning was needed under C.R.C.P. 107(a)(2). Second, the trial court abused its discretion by acting inconsistently with regard to its order to Aleem to remove his Tookie Williams T-shirt such that it nullified the justification for making him remove it— to preserve order in the courtroom.

## Authority of the Court

■ Courts are charged with a duty to maintain order within the courtroom and to insure a fair trial. *Ryan v. Cronin*, 191 Colo. 487, 553 P.2d 754, 755 (1976) (citing then-existing ABA Standards Relating to the Functions of the Trial Judge, Standard 7.1). The ABA Standards suggest that a judge has a duty to ensure that "every proceeding before him or her be conducted with unhurried and quiet dignity and should aim to establish such physical surroundings as are appropriate to the administration of justice." ABA Standards for Criminal Justice: Special Functions of the Trial Judge, Standard 6–1.1 (3d ed.2000). Although not binding precedent on this Court, we often cite to the ABA Standards and find them instructive in this case.

■ The judiciary has inherent authority to use all powers reasonably required to protect the efficient function, dignity, independence, and integrity of the court and judicial process. *Pena v. Dist. Court*, 681 P.2d 953, 956 (Colo.1984) (citations omitted). The power of contempt falls within a court's broad authority. *Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *In re J.E.S.*, 817 P.2d 508, 511 (Colo. 1991). A court may hold a party in contempt for any conduct which interferes with the court's administration of justice, is derogatory to the dignity of the court, or tends to bring the judiciary into disrespect. *Losavio*, 512 P.2d 266. Such conduct includes disruptive behavior that interrupts judicial proceedings or obstructs the administration of justice, and disobedience of a court order. C.R.C.P. 107(a)(1).

■ The Supreme Court recognizes the contempt power as absolutely essential to the duties imposed upon the court. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911). The dual purpose of the contempt power is to vindicate the dignity and the authority of the court and to preserve its viability. *See Bd. of County Comm'rs v. Nineteenth Judicial Dist.*, 895 P.2d 545, 548–49 (Colo.1995); *Thrap v. People*, 192 Colo. 341, 558 P.2d 576, 578 (1977).

■ There are limits, however, to the court's contempt power. It may not be used to protect the judge's dignity. *In re Estate of Elliott*, 993 P.2d 474, 478 (Colo.2000). It must be used with caution and self-restraint to vindicate the rights of litigants and promote the administration of justice. *Id.* Even so, we will only overturn a trial judge's finding of contempt upon a showing of an abuse of discretion. *Id.; People v. McGlotten*, 134 P.3d 487, 491 (Colo.App.2005). We now consider whether the court abused its discretion by holding Aleem in contempt and sentencing him to forty-five days in jail.

## First Amendment

Aleem argues that the trial court abused its discretion by holding him in contempt because his conduct was protected by the First Amendment. Aleem claims that the statement made by his Tookie Williams shirt is protected speech and thus he was justified in disobeying the trial court's order to remove it. We hold that the trial court's restriction of his speech was consistent with the First Amendment because a courtroom is a non-public forum for First Amendment purposes and the court's restriction of Aleem's speech was reasonable and viewpoint neutral.

■ We undertake a three-step inquiry to determine whether the court's restriction is permissible under the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Lewis v. Colo. Rockies Baseball Club*, 941 P.2d 266, 272–75 (Colo. 1997); *Holliday v. Reg'l Transp. Dist.*, 43 P.3d 676, 681–82 (Colo.App.2001). First, we consider whether the government is restricting protected speech and determine that

wearing a political T-shirt is protected speech. *Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439; *Lewis*, 941 P.2d at 272. Next, we must determine whether the courtroom is a public or non-public forum for First Amendment purposes and hold that it is a non-public forum. *Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439; *Lewis*, 941 P.2d at 272. Finally, we decide whether the court's restriction of Aleem's speech meets the standard for speech in a non-public forum and hold that it does. *Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439; *Lewis*, 941 P.2d at 275.

## Wearing a Political T-shirt is Protected Speech

 Aleem argues that his conduct was protected by the First Amendment. We agree in part. Wearing buttons or symbolic clothing is expressive First Amendment activity. *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (characterizing the wearing of a button or T-shirt as speech); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (recognizing that wearing black arm bands encompasses a primary First Amendment right).

Aleem's act of wearing the Tookie Williams T-shirt to make a political statement falls within this protected category of speech. The image of Tookie Williams accompanied by the word "redemption" has several expressive meanings. Aleem's shirt contains a symbol that has various meanings to different people.[3] Aleem argues that he was wearing the shirt for political and religious reasons. He notes that "redemption" carries the connotation of overcoming prior sin. The trial court, however, stated that it was concerned about allowing a political message into the courtroom. Hence, the T-shirt's po-

litical message was the basis of the court's restriction.

Because the court is a state actor, the government restricted his speech. *Shelley v. Kraemer*, 334 U.S. 1, 14, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *People v. Garberding*, 787 P.2d 154, 156 (Colo.1990). Hence, Aleem's T-shirt is protected speech and we must turn to the second step of the *Cornelius* analysis.

## The Courtroom is a Non-public Forum

 Although the status of a courtroom for purposes of the First Amendment is a question of first impression in this Court, we conclude, as have many other courts, that a courtroom is a non-public forum.

 To determine the level of First Amendment protection given to speech on government property, courts examine the nature of the forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Lewis*, 941 P.2d at 272. The Supreme Court has defined three types of fora: the traditional public forum, the governmentally designated public forum, and the non-public forum. *Perry*, 460 U.S. at 45–46, 103 S.Ct. 948; *Lewis*, 941 P.2d at 272. The type of forum where the speech occurs dictates the standard of review that applies to determine whether the government's restriction on that speech is permissible. *Perry*, 460 U.S. at 44, 103 S.Ct. 948; *Lewis*, 941 P.2d at 272. Speech in non-public fora receives lesser protection than speech in public or designated public fora. *Perry*, 460 U.S. at 46, 103 S.Ct. 948; *Lewis*, 941 P.2d at 272–73.

 A non-public forum is a public place that is not a forum for public communication, either by tradition or by designation.

---

**3.** The Petition for Clemency on behalf of Tookie Williams describes the complexity of the message of Tookie Williams. *Petition for Executive Clemency on Behalf of Stanley Tookie Williams, supra.* To many his image is symbolic of the political debate surrounding the death penalty; prosecutors may view it as anti-death penalty advocacy, while death penalty abolitionists may see it as an image of the continued injustice dealt by the death penalty. However, the symbolism of Tookie Williams' image is not limited to political argument for or against the death penalty. *Id.* at 1–2. Many members of the black community

view Tookie Williams as a hero because his advocacy for a life of redemption and condemnation of gang violence has saved many children from pursuing that path and convinced those already involved with gangs to seek their own personal redemption. *Id.* at 3–4. Further, many teachers and law enforcement officials view his image and work as a much-needed tool to reach out to young children or gang members and discuss the harsh realities that accompany a life of violence from the perspective of a man they respect. *Id.* at 5, 7.

*Perry,* 460 U.S. at 46, 103 S.Ct. 948; *Lewis,* 941 P.2d at 273. The defining feature of a non-public forum is that it has never been designated for indiscriminate expressive activity by the general public. *See U.S. Postal Serv. v. Council of Greenburgh,* 453 U.S. 114, 128–29, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). The mere use of a non-public forum for communicative purposes does not necessarily make it a designated public forum. *See id.*

██ A designated public forum is created when the government opens a non-public forum for use by the public for assembly and speech. *Cornelius,* 473 U.S at 802, 105 S.Ct. 3439. The Supreme Court has held, "[w]e will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Id.* at 803, 105 S.Ct. 3439.

██ By contrast, public fora "have immemorially been held in trust for the use of the public, and … have been used for purposes of assembly, communicating thought between citizens, and discussing public questions." *Perry,* 460 U.S. at 45, 103 S.Ct. 948 (quoting *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Traditional public fora typically include streets, sidewalks, and parks. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Lewis,* 941 P.2d at 272; *Holliday,* 43 P.3d at 682.

Courts that have considered the issue have held that courthouses, especially courtrooms, are non-public fora. *E.g., Grace,* 461 U.S. at 178, 103 S.Ct. 1702 (implying that the Supreme Court building and its grounds other than public sidewalks are non-public fora); *Huminski v. Corsones,* 396 F.3d 53, 90–91 (2d Cir.2005) (holding that courthouses and courtrooms are non-public fora); *Mezibov v. Allen,* 411 F.3d 712, 718 (6th Cir.2005) (holding that courtrooms are non-public fora); *Berner v. Delahanty,* 129 F.3d 20, 26 (1st Cir.1997) (holding that a courthouse, especially a courtroom, is a non-public forum).

██ We agree with these decisions and conclude that a courtroom is a non-public forum for First Amendment purposes. A courtroom is for the adjudication of civil and criminal disputes. *Berner,* 129 F.3d at 26; *Huminski,* 396 F.3d at 91. To fulfill this purpose, courtrooms demand intense concentration on important matters. *Berner,* 129 F.3d at 28. Hence, the disruption created by expressive activity within a courtroom weighs heavily against the conclusion that a courtroom is a public forum. *See Cornelius,* 473 U.S. at 804, 105 S.Ct. 3439. Further, courts have not granted general public access to the courtroom for expressive use. *Grace,* 461 U.S. at 178, 103 S.Ct. 1702; *Huminski,* 396 F.3d at 90–91. The mere fact that the public is admitted to the courtroom does not render it a public forum. *Grace,* 461 U.S. at 178, 103 S.Ct. 1702.

### The Court's Restriction is Reasonable and Viewpoint Neutral

██ Having determined that the courtroom is a non-public forum for First Amendment purposes, we now consider whether the court's restriction on Aleem's speech was proper. Speech in a non-public forum is subject to greater restriction than speech in public or designated public fora. Speech in a non-public forum can be restricted if two conditions are met: (1) the restrictions are reasonable and (2) the government is not suppressing the expression merely because the public official opposes the speaker's viewpoint. *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

### The Court's Restriction Was Reasonable

██ We find that the court's restriction of Aleem's political expression was reasonable because of the courtroom's narrow purpose and the court's duty to protect the parties' rights to a fair trial.

██ Courtrooms serve a very specific purpose as fora designated for the adjudication of civil and criminal matters. *Berner,* 129 F.3d at 26; *Huminski,* 396 F.3d at 91. Courtrooms must be neutral, politically impartial environments dedicated to fairness and equal treatment of the litigants. *Berner,* 129 F.3d at 27; *People v. Pennisi,* 149 Misc.2d 36, 563 N.Y.S.2d 612, 615 (1990). To this end, the court has an obligation to main-

tain courtroom decorum. *See Thrap,* 558 P.2d at 577–78.

The issue we must decide is whether a court's restriction of political speech is reasonable in carrying out its duty and purpose. As a general matter, the reasonableness of a restriction must be determined in light of the purposes of the forum and all of the surrounding circumstances. *Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439; *Huminski,* 396 F.3d at 92.

While we have not squarely addressed a court's ability to restrict political speech in the courtroom, we have implied that courts have authority to limit the speech of trial participants. In *Ryan,* we considered a case involving a trial court's contempt order against a defendant for refusing to remove a political button. 553 P.2d at 755. Although we did not analyze the First Amendment implications of the court's order because the issue was not before us, we implied that the trial court had the authority to maintain order within the courtroom by restricting a defendant's attempt to communicate to the jury with his button.[4] *Id.*

Other jurisdictions, however, have explicitly allowed restrictions on participants' as well as spectators' speech in the courtroom. Some jurisdictions have permitted trial courts to restrict political expression within the courtroom because it interferes with the courtroom's purpose. In *Berner,* the First Circuit held that a court did not violate a lawyer's First Amendment rights by ordering him to remove a button advocating a particular stance on a ballot initiative. 129 F.3d at 27. The First Circuit concluded that the attorney's political expression interfered with the purpose of the courtroom by "tarnish[ing] the veneer of political imperviousness that ideally should cloak a courtroom, especially when the partisan sentiments are completely unrelated to the court's business." *Id.* The court reasoned that allowing this political expression would undermine the neutrality of the courtroom by suggesting political partiality or favoritism by the court. *Id.* at 26–27.

Other jurisdictions have held that symbolic clothing or paraphernalia is disruptive to the courtroom's intended purpose to be scrupulously dedicated to the appearance of justice and fairness. One court stated:

[T]he wearing of noticeable or obtrusive, expressive or symbolic clothing, uniforms, and/or accessories, including ribbons, ties, armbands, buttons, flowers, etc., or other carrying of certain tangible objects such as signs, flags, dolls, pictures, distinctive books, etc., whether utilized as illustrations of concern, etc., ˙for or against persons, issues, or causes can constitute conduct disruptive to the courtroom environment, which environment must be scrupulously dedicated to the appearance as well as the reality of fairness and equal treatment.

*Pennisi,* 563 N.Y.S.2d at 616.

The court's duty to protect the People's and defendant's rights to a fair trial provides another basis for the court's restriction. Courts have recognized the need to restrict speech to avoid impermissible influences on the jury that may compromise a defendant's right to a fair trial. *See, e.g., Carey v. Musladin,* —— U.S. ——, 127 S.Ct. 649, 653–54, 166 L.Ed.2d 482 (2006) (holding that while some lower courts have held that spectator speech infringes upon a defendant's right to a fair trial, federal law regarding the potentially prejudicial effect of spectators' courtroom conduct is not clearly established); *Norris v. Risley,* 918 F.2d 828, 831–33 (9th Cir.1990) (holding that the trial court's restriction of spectators' wearing of buttons reading "Women Against Rape" during a rape trial was proper under the First Amendment because it presented an unacceptable risk of impermissible outside influence to the jury).

A defendant's clothing may impact his right to a fair trial. *Estelle v. Williams,* 425 U.S. 501, 504–05, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Eaddy v. People,* 115 Colo. 488, 174 P.2d 717, 718–19 (1946). In order to preserve the right to a fair trial, defendants may not be brought before a jury handcuffed and shackled to

---

4. The only issue before this Court was whether the district court had jurisdiction to review the contempt order. *Id.*

avoid interference with the jury's fair and just decision of the question of non-guilt. *Estelle*, 425 U.S. at 504, 96 S.Ct. 1691. The fact that a defendant, by his own conduct, jeopardizes his right to a fair trial is of little consequence. *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir.1969).

Because determining the actual impact a particular practice has on the judgment of jurors is difficult, it is unnecessary that jurors indicate that their ability to be impartial has been affected. *See Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *In re Stone*, 703 P.2d 1319, 1322 (Colo.App.1985). Whether a political message creates a noticeable disruption in the courtroom is not determinative because it is at the very least distracting. *Berner*, 129 F.3d at 28.

We conclude that on balance the court's obligation to maintain courtroom decorum and ensure parties' rights to a fair trial outweighs trial participants' and spectators' First Amendment rights to express political views. Hence, a court's restriction of political views within the courtroom will generally be reasonable.

Here, the trial court's order that Aleem remove his Tookie Williams T-shirt was reasonable because the shirt contained several political messages that had the potential to interfere with the courtroom's purpose and impact the parties' rights to a fair trial by affecting the jurors' ability to be impartial. Because it was the defendant, Aleem, who wore the shirt, the potential for distraction and prejudice was especially high.

One of the court's purposes in ordering Aleem to remove the shirt was to maintain courtroom decorum. The trial court, like the trial court in *Berner* that required the removal of a political button, acted to preserve the courtroom for its intended purpose: a trial of criminal charges. The court informed Aleem that it would not allow him to be a political activist within the courtroom, repeatedly stating that the courtroom is a place for the presentation of evidence, not for political activism.

The trial court also acted reasonably in restricting Aleem's political speech because it sought to preserve the parties' rights to a fair trial. The court recognized that a defendant's clothing may affect his right to a fair trial, as we held in *Eaddy*. The court stated that it ordered Aleem to remove his T-shirt to ensure that the jury was not improperly influenced by extraneous information, in this case the political statement made by his shirt.

Aleem argues that the court's order to remove his T-shirt was not justified by any possible distraction or prejudice to the parties because no evidence in the record indicates that the jury was prejudicially influenced by his shirt. We disagree, because as the *Berner* court held, actual evidence of jury disruption is not necessary where the speech at issue is at least distracting. It was reasonable for the trial court to conclude that Aleem's T-shirt was, at the very least, distracting because of its politically charged content. We therefore conclude that the court's restriction of Aleem's speech was reasonable.

## The Court's Restriction Was Viewpoint Neutral

Next, we address whether the court's restriction was viewpoint neutral and conclude that it was.

While content discrimination is allowed in non-public fora because the limited purposes of such fora justify government restriction of the subject matter of speech and the speaker's identity, the government violates the First Amendment when it makes restrictions based on the point of view espoused by the speaker. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439; *Perry*, 460 U.S. at 48–49, 103 S.Ct. 948. Content or subject matter discrimination occurs when a state regulates speech based on its topic or subject matter irrespective of the viewpoint expressed by the speaker. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 811–12, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (holding that a law which regulated only sexual speech was a subject matter restriction); *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (stating that a law that only al-

lowed picketing on the subject of labor was subject matter discrimination).

 Viewpoint discrimination occurs when the government restricts speech based upon the position advocated by the speech. *Perry,* 460 U.S. at 46, 103 S.Ct. 948. As such, viewpoint discrimination is a more egregious form of content discrimination because the government controls the dialogue or different viewpoints about a particular subject matter. *See Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *Mesa v. White,* 197 F.3d 1041, 1047 (10th Cir.1999). In a non-public forum, viewpoint discrimination differs from content discrimination because the government can restrict the general subject matter of speech (content discrimination) without engaging in viewpoint discrimination. Courts have held that viewpoint discrimination occurs when the government chooses among similarly situated speakers to advance or suppress a specific point of view merely because the public official opposes that view. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 393–94, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Perry,* 460 U.S. at 46, 103 S.Ct. 948. For example, a state engages in viewpoint discrimination when it permits pro-death penalty speech, but restricts anti-death penalty speech.

 The challenge for courts when reviewing the state's restriction of speech in a non-public forum is to distinguish between what constitutes permissible content discrimination based on subject matter as opposed to impermissible viewpoint discrimination. *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 970 (9th Cir.2002); *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100 F.3d 1287, 1298 (7th Cir.1996). Because the line between content and viewpoint discrimination is difficult to discern, courts must carefully scrutinize any content-based discrimination. *Grossbaum,* 100 F.3d at 1298. While we have never defined the analysis courts should employ to make this distinction, we find the Ninth Circuit's reasoning in *Sammartano* helpful.

*Sammartano* sets forth two considerations that guide us to determine whether a particular restriction is based on the subject matter or viewpoint. *Sammartano,* 303 F.3d at 970–71. First, we must be sure that the restriction is of the appropriate level of generality—that the court's restriction is of a subject and not the viewpoint of that subject. *Id.* at 971–72. For example, a restriction targeting "all bikers" wearing clothing indicating their affiliation with biker groups is not an appropriate subject matter restriction because it is too narrow. *Id.* It targets the viewpoint of those wearing clothing indicating an affiliation with some organization or point of view. *Id.* In *Lamb's Chapel,* the Supreme Court held that a state's restriction discriminated on the basis of viewpoint when the state allowed the presentation of all views pertaining to a particular issue except for those dealing with the subject matter from a religious perspective. 508 U.S. at 393–94, 113 S.Ct. 2141.

The court's motivations are important to this analysis. *Sammartano,* 303 F.3d at 971; *Grossbaum,* 100 F.3d at 1298. If there is reason to regulate a certain expression—for example there is a record of past incidents of violence or disorder specifically linked to certain clothing—then a narrower subject matter restriction may be permissible because the reason for this restriction is not merely that the public official opposes the view. *Sammartano,* 303 F.3d at 972.

 Second, courts must evaluate the expression and determine whether it is truly incompatible with the forum. If the expression is incompatible, then the restriction is more likely to be permissible. *Sammartano,* 303 F.3d at 971 (citing *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439). Again, the court's motivations can be determinative. If the court intends to restrict the particular message rather than to protect the purpose of the forum, then the restriction constitutes viewpoint discrimination. *Id.; Perry,* 460 U.S. at 49, 103 S.Ct. 948 (upholding a provision of a public school collective bargaining agreement which granted preferential access to the interschool mail system in part because "[t]here is ... no indication that the school board intended to discourage one viewpoint and advance another"). The government's intent matters even if the restriction itself is facially viewpoint neutral. *Cornelius,* 473 U.S. at 812, 105 S.Ct. 3439. To determine this intent, in addition to considering the

stated purpose for the restriction we also consider the court's application of the restriction to determine whether the restriction is a pretext for viewpoint discrimination. *Mesa,* 197 F.3d at 1048; *Holliday,* 43 P.3d at 683–84.

Turning to the facts of this case, when the trial court ordered Aleem to remove his Tookie Williams T-shirt, it did so to prevent the jury from reading the message on his T-shirt. Applying the *Sammartano* analysis, we conclude that the court's restriction was viewpoint neutral.

Under the first *Sammartano* consideration of whether the restriction is a general one, we note that the court ordered Aleem to remove the T-shirt because it contained "political speech." Political speech is the broad category of speech being restricted. The court at no time referred to a specific subset of political speech, such as a statement about the death penalty or the meaning of redemption. Neither did the court say nor imply that its order to remove the T-shirt was based on any statement or political message contained on the T-shirt. Hence, we conclude that the restriction was of a general subject matter. *See Cornelius,* 473 U.S. 788, 105 S.Ct. 3439 (upholding an exclusion of political speech from a non-public forum).

Addressing the second consideration under *Sammartano,* we consider whether the trial court was seeking to protect the purpose of the forum—in this case the purpose of the courtroom to adjudicate disputes and provide a forum for fair trials—by ordering this restriction. We conclude that it was.

When the court ordered Aleem to remove his Tookie Williams T-shirt, it stated that he was not allowed to wear it because the courtroom is not a place for political activism, but a forum for the presentation of evidence. The court said it would restrict any political speech with a similar order. However, the court apparently allowed jurors to wear clothing with various levels of political content, including a Hustler hat, a Bob Marley T-shirt, and a NASCAR T-shirt.

When conducting the reasonableness analysis we concluded that a trial court may reasonably determine that political speech is inconsistent with the purpose of the courtroom. Therefore, on its face this restriction appears viewpoint neutral because the stated purpose of the court's order is to protect the purpose of the forum, not to restrict the particular message contained by the T-shirt. The more difficult issue, however, is whether the court's inconsistent application of this restriction reveals discrimination against Aleem's specific viewpoint.

Aleem argues that the court's restriction was not viewpoint neutral because it did not order the removal of political clothing worn by jurors including a Hustler hat, a Bob Marley shirt, and a NASCAR shirt. Aleem argues that these items also contain political messages. He notes that Bob Marley was a reggae musician and a political figure in Jamaica also associated with the Rastafarian religion and Black Nationalism. Aleem also argues that NASCAR followers are generally considered Southern, white conservatives. He did not address the possible political message made by the Hustler hat, and therefore we do not speculate as to its political implications.

We recognize that Bob Marley was a political figure whose image constitutes expressive speech similar to that of Tookie Williams.[5] Nothing in the record, however, indicates that the court intentionally restricted the Tookie Williams T-shirt but did not order a similar restriction of the juror's Bob Marley T-shirt because it disfavored the political message made by Tookie Williams. Our review of the record indicates that the court did not oppose the viewpoint the Tookie Williams T-shirt presented. The court neither stated nor implied a specific concern with the message contained in Aleem's T-shirt. In the court's words, it "certainly respected [Aleem's] position."

When Aleem asked the court about other examples of political speech, the court stated that it would give the same order if another participant's clothing contained political speech and this fact was brought to its attention by objection. The court explained to Aleem that if the prosecutor had worn a tie

---

5. Because we find that the Bob Marley T-shirt includes a political message, we need not address the more subtle and difficult question of whether NASCAR is a political symbol.

with a political symbol on it that it would have ordered him to remove it.

Aleem did not object to either the juror's Bob Marley T-shirt or the juror's NASCAR T-shirt during trial. We acknowledge that our review of whether the court's restriction was viewpoint neutral might be impacted had there been some indication that the trial court was aware that jurors were wearing T-shirts containing political speech similar to that of the Tookie Williams T-shirt and did not order their removal, but such is not the case. Unlike Aleem's T-shirt, which was brought to the court's attention by the prosecutor's objection, there were no objections raised concerning the juror's T-shirts. We have no evidence that the court was aware of the presence of these T-shirts in the courtroom, and, if so, whether it knew of their political significance.

Hence, based on a full review of the record we conclude that the court acted within its discretion consistent with its responsibility to preserve the purpose of the courtroom when it ordered Aleem to remove his Tookie Williams T-shirt, after concluding that the political speech brought to its attention might improperly influence the jury. Courts are given broad discretion to protect the court's function and purpose. The court's order to remove the T-shirt was consistent with the purpose of the courtroom as a forum for the presentation of evidence and the court's duty to ensure Aleem's and the People's right to a fair trial. Thus, we conclude that this order was viewpoint neutral.

Having concluded that the trial court's order to Aleem to remove his T-shirt did not violate his First Amendment rights, we turn to whether the trial court abused its discretion when it held Aleem in contempt and sentenced him to forty-five days in jail.

### The Trial Court's Contempt Findings

A court's discretionary power to hold parties in contempt is necessarily broad because of the contempt power's broad purpose of ensuring that the court's functions

remain unimpeded. *Mainland v. People*, 111 Colo. 198, 139 P.2d 366, 367 (1943). More specifically, the purpose of the contempt power is to maintain the dignity and authority of the court and to preserve its functionality. *Bd. of County Comm'rs*, 895 P.2d at 548–49; *Thrap*, 558 P.2d at 577. C.R.C.P. 107 limits the court's contempt power by defining the type of behavior that courts may punish with contempt sanctions. Behavior subject to contempt sanctions is disorderly or disruptive behavior and disobedience of any lawful order of the court. C.R.C.P. 107(a)(1). Hence, to determine whether the trial court here abused its discretion, we undertake a fact-based analysis which considers the particular circumstances presented here.

Initially, we consider the context in which Aleem's behavior occurred. All of Aleem's allegedly contemptuous behavior arose from the trial court's initial order to remove his T-shirt depicting Tookie Williams. When Aleem refused to remove his shirt, the court engaged in an extensive dialogue regarding the validity of the court's order with Aleem and his attorney that spans twenty-five pages of the trial transcript. The tone of this discussion was passionate on both sides, with Aleem expressing the reasons why he did not want to take off his shirt and the court responding with its justification and explanation why it was important for him to do so. The transcript reveals mounting frustration on both sides. The court attempted to be sensitive to Aleem's position by allowing him to speak his views, but eventually lost patience because of the delay the discussion was causing and his insistence on expressing his political views. We summarize this portion of the record.

After Aleem defied the court's order to remove his shirt four times, the court held him in contempt and ordered him into custody.[6] Just before his removal from the courtroom, Aleem accused the judge of hiding behind the podium, called the court a "demonocracy," and warned that the People would

---

6. It is unclear from the record whether the trial court intended at this point for the contempt sanctions to be punitive—to punish Aleem for disobeying a court order—or remedial—to compel Aleem's compliance with the court's order to remove his shirt. *See* C.R.C.P. 107(a)(4) (defin-

ing punitive sanctions for contempt as punishment for conduct that is found to be offensive to the authority and dignity of the court); C.R.C.P. 107(a)(5) (defining remedial sanctions for contempt as sanctions imposed to force compliance with a lawful order).

be held accountable if anything happened to him in custody, saying, "I know what you devils is about." While Aleem was in custody, the trial court discussed Aleem's behavior with his attorney, informing him that the court would not tolerate any further political attire for the remainder of the trial, and asking Aleem's attorney to explain to him that the court did not want any additional "outbursts" or "affront to the dignity of [the court]."

Aleem apologized when he returned to the courtroom. He explained that he refused the court's order to remove his Tookie Williams T-shirt because he is a political activist, that he wears that type of shirt every day, and that he did not feel that he should have to change his attire to appear before the court by "put[ting] on some monkey suit or something out of character with who I am." The court then told him that it respected his position, but that it was under a duty to control the courtroom and to ensure the integrity of the process so that all parties achieve a fair trial.

The court then allowed him to wear the shirt for the rest of the day at trial. When Aleem asked about the status of his contempt sanctions, the court told him that it had found him in contempt and issued a show cause order to appear on the contempt charge, setting the hearing for after the conclusion of the trial.

At the show cause hearing, the court reaffirmed that it had already decided the contempt issue at trial and sentenced Aleem to forty-five days in jail. The court did not give Aleem an opportunity to contest the contempt, but instead told him that whether he was in direct contempt had already been determined. As a result, it is unclear whether this was really a show cause hearing or merely a sentencing hearing. Adding to the confusion, the court noted that Aleem's conduct at trial was "egregious" and "out of control," and besides wearing an inappropriate political T-shirt, included arriving late to trial, yelling at the court and calling it "demonocracy," and orchestrating his supporters to stand and chant. It is unclear from the record whether the behavior besides his refusal to remove his Tookie Williams T-shirt provided additional bases for the court's contempt holding, or whether the court considered this other behavior as justification for enhancing Aleem's sentence. Notably, Aleem's attorney stated that he understood prior to the hearing that Aleem was being held in contempt only for refusing to remove his T-shirt.

We now turn to C.R.C.P. 107 to determine whether the trial court abused its discretion.

### The Warning Requirement

■ In cases of direct contempt, our rules of civil procedure require the trial court to warn a person to stop disruptive behavior unless that person's conduct is "so extreme that no warning is necessary." C.R.C.P. 107(a)(2). Hence, absent a prior warning, a court may hold a person in direct contempt for "extreme" behavior, or for behavior "that has been repeated despite the court's warning to desist." *Id.*

■ We cannot overstate the importance of this warning for behavior that is not so extreme as to be clearly contemptuous.[7] A court's failure to warn a person before holding him in contempt for conduct that is not extreme acts as a complete defense to the contempt charge. Unless the conduct is extreme, unwarned behavior is, by definition,

---

7. Although Colorado is one of only a few jurisdictions that requires a prior warning by rule or statute, federal courts and many other state courts recognize the importance of warning a person before making a finding of direct contempt. *See, e.g., In re Chaplain,* 621 F.2d 1272, 1276 (4th Cir.1980) (holding that advance warning must be given to a possibly unaware contemnor that a contempt conviction may ultimately result from his repeated conduct); *United States v. Abascal,* 509 F.2d 752, 755 (9th Cir.1975) (recognizing that under some circumstances, a warning is necessary before a court may impose sanctions for criminal contempt); *United States*

*v. Schiffer,* 351 F.2d 91, 95 (6th Cir.1965) (recognizing that prior warnings are generally desirable); *Boysaw v. Superior Court,* 23 Cal.4th 215, 96 Cal.Rptr.2d 531, 999 P.2d 748, 752 (2000) (requiring a prior warning unless the conduct is outrageous and immediately recognizable as an act of contempt); *In re Herkenhoff,* 122 N.M. 766, 931 P.2d 1382, 1385 (1997) (requiring a prior warning where the conduct is not "flagrant"); *Weaver v. Superior Court,* 572 P.2d 425, 428 (Alaska 1977) (requiring a prior warning before a court may hold a person in direct criminal contempt).

not contemptuous under C.R.C.P. 107(a)(2). Likewise, if a person stops non-extreme misconduct after the court's warning, then there can be no finding of direct contempt under C.R.C.P. 107(a)(2).

C.R.C.P. 107 was amended in 1995 to require a prior warning for all but extreme conduct. It appears from a letter from Richard W. Laugesen, Chairman of the Supreme Court Civil Rules Committee, that the purpose of this amendment was to bring the rule into conformity with Colorado case law requiring a prior warning, including *People v. Ellis*, 189 Colo. 378, 540 P.2d 1082, 1083–84 (1975). Letter from Richard W. Laugesen, Chairman, Supreme Court Civil Rules Committee, to Howard M. Kirshbaum, Justice, Supreme Court of Colorado (Nov. 15, 1994) (on file with the Colorado Supreme Court).

The warning requirement in C.R.C.P. 107 is consistent with The ABA Standards for Criminal Justice, which also require a warning. ABA Standards for Criminal Justice: Special Functions of the Trial Judge, *supra*, Standard 6–4.3. The ABA Standards for Criminal Justice aptly summarize the purposes of a prior warning. First, a warning may be effective to stop further disruption and is thus preferable to contempt sanctions when misbehavior initially arises. *Id.* at Commentary to Standard 6–4.3. Second, a warning assures the court and public that further misconduct will be considered willfully contemptuous and deserving of punishment. *Id.*

Because we have not previously considered what kind of conduct might qualify as "extreme" under C.R.C.P. 107, such that no prior warning is needed, cases predating the 1995 amendment to C.R.C.P. 107 are instructive here. In two cases, contempt findings were reversed where trial courts failed to

warn contemnors about behavior that can be classified as less than "extreme." *Ellis*, 540 P.2d at 1083–84 (where a criminal defendant answered the court's questions in a manner that "offended the trial judge"); *Hill v. Boatright*, 890 P.2d 180, 187 (Colo.App.1994) (where an attorney disagreed with the court's interpretation of an ethical rule by saying, "Sir, it does not"), *rev'd in part on other grounds, Boatright v. Derr*, 919 P.2d 221 (Colo.1996).

On the other hand the court of appeals upheld a trial court's finding of direct contempt without a prior warning under C.R.C.P. 107 for conduct that it found so extreme that no warning was necessary. *People v. Holmes*, 967 P.2d 192, 194 (Colo. App.1998). In *Holmes*, an attorney, who was also a criminal defendant at the time, directed an "obscene comment" toward the prosecutor by calling the court's offer to continue his hearing "protracted bullshit." *Id.* at 193. The court considered the fact that the contemnor was an attorney and thus "under a duty to conduct himself with civility in court proceedings." *Id.* at 194.

We find cases from other jurisdictions helpful in determining the level of misbehavior that requires a prior warning. Other courts have drawn the line by requiring a warning for "borderline conduct" that the contemnor may not be aware is contumacious. *United States v. Thoreen*, 653 F.2d 1332, 1341 (9th Cir.1981); *United States v. Seale*, 461 F.2d 345, 366 (7th Cir.1972).[8] We find particularly persuasive other jurisdictions' consideration of the status of the contemnor, reasoning that a party to a proceeding is held to a lesser standard of awareness of what constitutes proper conduct in the courtroom than an attorney. *E.g., Thoreen*, 653 F.2d at 1341 (reasoning that an attorney

---

**8.** For example, the Second Circuit held that a warning is required "where a reasonable person would not know that the court considered his conduct contemptuous." *In re Pilsbury*, 866 F.2d 22, 27 (2d Cir.1989). In so holding, the Second Circuit overturned a contempt conviction where a trial court failed to warn an attorney before holding her in contempt for proceeding with "exaggerated slowness" after being ordered to leave the courtroom and asking if the judge's comments were on the record. *Id.* at 26–27.

The Fourth Circuit likewise reasoned that a warning is required before a possibly unaware

contemnor is held in contempt for a "last straw" repetition of conduct. *In re Chaplain*, 621 F.2d at 1276. The conduct at issue in that case included a pro se defendant continually interrupting the judge, refusing to sit down at the judge's direction, badgering witnesses, evading questions from the bench, and "refus[ing] to observe even minimal requirements of common civility." *Id.* at 1274. The Fourth Circuit upheld the contempt conviction, reasoning that the court adequately warned the contemnor that further interruptions would result in contempt. *Id.* at 1277.

who had years of trial experience should have been aware of the widespread custom of only allowing attorneys and parties to sit at the counsel table, such that no warning was necessary before holding him in contempt for violating this custom). *See also Seale,* 461 F.2d at 366 (defining conduct constituting misbehavior to support a contempt conviction as "conduct inappropriate to the particular role of the actor, be he judge, juror, party, witness, counsel or spectator").

■ Turning to this case, the record reveals that the trial court warned Aleem that it would hold him in contempt if he did not remove his Tookie Williams T-shirt, but, in contrast, it did not warn him that his other behavior at trial was potentially contemptuous.[9] At the show cause hearing, the trial cited Aleem not only for refusing to remove his T-shirt, but also for arriving late to trial,[10] and for yelling at the court and calling it a "demonocracy." Thus, by applying C.R.C.P. 107(a)(2), this conduct is not contemptuous unless it is so extreme that no warning was needed. Hence, we determine whether this behavior was sufficiently "extreme" to excuse the warning requirement.

■ First, we note that under the context in which it occurred here, yelling at the court and calling it a "demonocracy" is borderline conduct for which a prior warning is required. When considered in isolation, such name-calling very well may be contemptuous conduct for which direct contempt sanctions are appropriate. In this case, however, Aleem's comment occurred in the context of the court's extended colloquy regarding the validity of and the reason for its order to remove his Tookie Williams T-shirt. We find this behavior distinguishable from the extreme conduct found in *Holmes* because "demonocracy," unlike calling a court order "protracted bullshit," is not an obscenity, and because unlike the contemnor in *Holmes,*

Aleem is not an attorney. Instead, Aleem is a criminal defendant and a self-described political activist. As a non-attorney, Aleem may be accustomed to a certain type of expression, and as such, he is not held to a standard consistent with familiarity with the legal setting. Aleem's status as a non-attorney, when combined with the particular circumstances of the lengthy dialogue in which the court and Aleem engaged as to why his T-shirt should be removed, weighs against finding his conduct to be so extreme that no warning was needed before holding him in contempt.

We note that the purposes of giving a warning might have been served had Aleem been properly warned. Such a warning might have avoided continued disruptions and continued disrespect of the court. Of course, such a warning would have put him on notice that further misconduct would be considered willfully contemptuous and deserve punishment. For example, if the court had warned Aleem when he called the court a "demonocracy," it could have held him in contempt under C.R.C.P. 107(a)(2) when he later said, "I know what you devils is about." Hence, prior to being held in contempt for yelling and calling the court a "demonocracy" and using the word "devils" to describe the system, Aleem should have been given a warning that this behavior was unacceptable and that, if repeated, would constitute contempt of court and be punishable by contempt sanctions. Absent this required warning and under the circumstances presented, we hold that Aleem's behavior was not contemptuous.

### The Trial Court's Inconsistency in Handling Aleem's Tookie Williams T-shirt

■ Initially, the trial court followed the proper procedure required under C.R.C.P.

---

9. At most, the court warned Aleem's attorney, outside Aleem's presence, about his behavior. We need not decide whether this indirect warning complies with C.R.C.P. 107(a)(2) because all of Aleem's contemptuous behavior cited by the trial court at the show cause hearing preceded the court's discussion with Aleem's attorney.

10. While Aleem's tardiness occurred in front of the court, circumstances outside of court led to this behavior. Contemnors are entitled to an

evidentiary hearing when circumstances outside of the presence of the court may constitute a lawful justification for a contemnor's contemptuous behavior in court. *See People v. Lucero,* 196 Colo. 276, 584 P.2d 1208, 1212–13 (1978); *People v. Ganatta,* 622 P.2d 107, 109 (Colo.App. 1980). Because the trial court did not give Aleem an evidentiary hearing on this issue, this cannot be a proper ground for holding Aleem in direct contempt.

107(a)(2) to hold Aleem in direct contempt during the trial for refusing to remove his Tookie Williams T-shirt after giving repeated warnings that his failure to do so would result in contempt. At that point, the court's direct contempt finding, coupled with either punitive or remedial sanctions, would have been justified to preserve the purpose of the court proceedings to prevent the introduction of impermissible influences to the jury, and to vindicate the dignity and authority of the court after Aleem's refusal to obey its order. *See* C.R.C.P. 107(a)(4) (defining punitive sanctions for contempt as punishment for conduct that is found to be offensive to the authority and dignity of the court); C.R.C.P. 107(a)(5) (defining remedial sanctions as those imposed to force compliance with a lawful order).

The trial court's actions with regard to Aleem's T-shirt, however, were inconsistent with either the purpose of punitive or remedial sanctions. After exercising its discretion to order Aleem to remove his T-shirt and to hold him in direct contempt for refusing to do so, the court retracted these discretionary orders and allowed Aleem to wear the shirt for the rest of that day. The court undermined its initial discretionary decision that the shirt was potentially disruptive to the jury when it nevertheless exercised its discretion to allow him to wear it in front of the jury. Then, at the subsequent show cause hearing, the court treated the hearing as a mere sentencing hearing when it sentenced Aleem to forty-five days in jail.

When the trial court retracted its contempt finding and allowed Aleem to wear his shirt in front of the jury, it nullified any remedial or punitive justification for making him remove his shirt. If the court's initial purpose was remedial, then sanctioning Aleem after the trial for refusing to remove his T-shirt served no legitimate purpose because there was no immediate need to restore courtroom order at the show cause hearing. Likewise, if the court's purpose for sanctioning Aleem at trial was punitive, then allowing him to wear the shirt at trial undermined this purpose. The retraction of the contempt order followed by a finding of punitive contempt after the fact for conduct that the court expressly allowed appears fundamentally unfair.

We note that the trial court had other options for dealing with Aleem's disobedience besides holding him in contempt. A court's duty to invoke the contempt power with caution and self-restraint, *Elliott*, 993 P.2d at 478, includes a duty to consider less drastic alternatives to contempt sanctions. *In re Chaplain*, 621 F.2d at 1276. Such alternatives include removing a defendant from the courtroom until he promises to conduct himself properly or binding and gagging him. *Allen*, 397 U.S. at 343–44, 90 S.Ct. 1057. If the court wanted to continue with the trial instead of deciding the contempt issue when it arose, either of these options would have been more suitable solutions than allowing him to wear the offending shirt anyway and then punishing him for it later. Hence, we conclude that the trial court, through its inconsistent actions, abused its discretion by sanctioning Aleem for refusing to remove his Tookie Williams T-shirt.

We hold that the trial court abused its discretion by holding Aleem in direct contempt: (1) by failing to warn Aleem before holding him in direct contempt for behavior that was not extreme under C.R.C.P. 107(a)(2); and (2) by inconsistently ordering Aleem to remove his Tookie Williams T-shirt and then permitting him to wear it in front of the jury, such that it nullified any justification for its initial order to remove it.

## V. Conclusion

We make the rule to show cause absolute and reverse the court's contempt finding and sentence.

Justice COATS concurs in the judgment only.

Justice EID does not participate.

Justice COATS, concurring in the judgment only.

While I agree that the trial court's contempt order must be vacated, I do not join the majority opinion.

Whether summary contempt at trial might have been justified under the circumstances of this case or not, the trial court simply failed to summarily hold the defendant in

contempt for the conduct which it ultimately sanctioned with incarceration; and it clearly violated the dictates of procedural due process by citing the defendant at a later time, without affording him notice or an opportunity to defend. Because the majority effectively acknowledges as much, I consider wholly gratuitous its exploration of the complex relationship between contempt powers and First Amendment guarantees, as well as its attempt at severely restricting the type of conduct summarily punishable as contemptuous. Perhaps most importantly, however, I object to the majority's unspoken (but unmistakable) presumption, which flatly conflicts with the prior jurisprudence of this court, that rule 107 of the Colorado Rules of Civil Procedure circumscribes the inherent contempt powers of the criminal courts of this jurisdiction.

The power to punish conduct that obstructs the administration of justice or tends to bring the court into disrepute is an inherent and indispensable power of the court. *People v. Barron,* 677 P.2d 1370, 1372 (Colo. 1984); *Wyatt v. People,* 17 Colo. 252, 28 P. 961 (1892). Rule 107 of the rules of civil procedure prescribes a procedure for punishing contemptuous conduct, which generally complies with due process. *See People v. Lucero,* 196 Colo. 276, 584 P.2d 1208 (1978). Whether or not the rule also circumscribes the inherent powers of those courts to which the civil rules apply, we have made clear that it does not limit the powers of criminal courts. *See Barron,* 677 P.2d at 1372–74; *see also id.* at 1374–76 (Neighbors, J., dissenting) ("I would put an end to the uncertainty and hold that C.R.C.P. 107 provides the exclusive means of punishing criminal contempt under the presently existing statutes and rules....").

Both rule and case law recognize the validity of summary contempt orders under limited circumstances. Because summary proceedings inherently conflict with fundamental precepts of due process, however, they have been sanctioned (except in the most unique of circumstances) only in circumstances of immediate necessity. *See Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974). Rather than finding it necessary to maintain order or force compliance with any particular court order by summary contempt,

the trial court below, after lengthily disputing with the defendant, ultimately acquiesced in the defendant's refusal to remove the shirt in question and permitted him to remain in the courtroom while wearing it. Despite initially placing him in custody and having him removed from the courtroom, the trial court relented at that point, released the defendant from restraint, and merely ordered him to show cause, after trial, why he should not be held in contempt. Not only did the trial court ultimately cite the defendant for refusing to remove his shirt, but also for other unwarned behavior it considered offensive, all without notice or an opportunity to defend.

That being the case, nothing more was required of this court in the exercise of its original jurisdiction than to vacate the trial court's order for failing to meet minimal standards of due process. Whether, or to what extent, a criminal defendant's First Amendment rights might further limit the ability of a court to maintain decorum and exact compliance with its orders through summary proceedings need not be resolved in this case. Similarly, where unnecessary to the resolution of any pending controversy, as here, I consider it extremely ill-advised to attempt an exclusive definition of conduct subject, without specific warning, to sanction as contemptuous. We have long emphasized that the notion of due process must remain flexible enough, in this context as in others, to account for a wide variety of circumstances and competing interests. *See, e.g., Barron,* 677 P.2d at 1373 (quoting *Austin v. City & County of Denver,* 156 Colo. 180, 184, 397 P.2d 743, 746 (1964)).

As I have noted elsewhere and in other contexts, *see, e.g., Medina v. People,* 114 P.3d 845, 861 (Colo.2005) (Coats, J., concurring in judgment); *Colo. Ground Water Comm'n v. N. Kiowa–Bijou Groundwater Mgmt. Dist.,* 77 P.3d 62, 81 (Colo.2003) (Coats, J., concurring in part and dissenting in part), I consider it important not to confuse an authoring judge's summarization and interpretation of broad legal doctrines with the court's creation of law through the resolution of actual cases and controversies. Because I fear the distinction is not easily made by lower courts

busily attempting to decipher and apply our holdings, and because I have become convinced that the mind is less sharply focused when the outcome of the litigation is not dependent upon the court's opinions, I am loath to opine more broadly than necessary to give context to the judgment resolving the case. I therefore do not join what I consider to be the majority's wide-ranging dicta concerning the contempt power.

Instead, I concur only in the judgment of the court.